1820.

BRUSH
v.
WILKINS.

---

F. BRUSH *against* WILKINS and BRADISH, *executors of* J. BRUSH.

Subsequent marriage *and* birth of a child, are an implied revocation of a will, either of real or personal estate.

But such presumptive revocation may be rebutted by circumstances.

*It seems* that a subsequent marriage or subsequent birth of a child alone, will not amount to a revocation.

A will duly executed, but revoked by marriage, and the birth of a child, cannot be connected with a will subsequently made, but not executed with the requisite solemnities to pass real estate, so as to constitute a valid will; but the estate descends to the heir at law.

June19*th,* and
*August* 1*st.*

ICHABOD BRUSH, the testator, formerly of *Dema-rara, South America,* but late of *Huntington,* in the county

of *Suffolk*, deceased, being seised of real and personal estate here and elsewhere, made his will, duly executed and attested, dated *March* 6, 1807, by which he directed, (1.) That his plantation, slaves, and effects, in the colony of *Demarara*, be sold by his executors : (2.) That his executors pay to Miss *E. Wilkins*, 20,000 dollars, in five annual payments, and in case of her death, to her parents : (3.) That they pay to the plaintiff, his sister, 500 dollars, annually, during her life. The testator, after making various other bequests, and giving the residuum of his estate to his brothers and sisters, appointed five executors, of whom the defendants, of the city of *New-York*, were two. In *June*, 1808, the testator married Miss *E. Wilkins ;* and afterwards, made another will, dated *Huntington, March* 14, 1809, in which he revoked all former wills, and made various bequests and dispositions of his estate, different from those contained in his former will ; giving to the plaintiff an annuity of 300 dollars, for life, and to his wife, jointly with the child of which she was then *enseint*, his estate at *Huntington,* &c., and appointed the defendants, and two of the other persons, named in the former will, his executors, who were directed to sell his plantations, slaves, &c. in *D.* The testator died at *H.* the 1st of *August*, 1809, leaving one child; and the second will, subscribed by him, but not published in the presence of witnesses or attested, was found with the first will, sealed up in the same envelope, among his valuable papers. The defendants treated the first will as a nullity, and on the 22d of *August*, 1809, proved the second, as the testator's last will and testament; and no person proved or acted under the first will. The bill charged, that the defendants had possessed themselves of the personal estate of the testator, in this state, and in *Demarara*, and received the produce of the real estate ; and *prayed* that the defendants might be decreed to set forth the situation, &c. of the real estate at *D.*, and the produce thereof, and to account with

the plaintiff for the personal estate, and the income of the real estate, which had come to their hands, and pay to the plaintiff her annuity, and for general relief.

The defendants, in their answer, admitted that they proved the second will, and possessed themselves of the *personal* estate, and made an *inventory*, to which they referred, containing a just and true account of such personal estate; that they were advised, that the *slaves on the plantation* belonging to the testator in *D.*, by the laws of that colony, passed with the plantation as *immoveable* property; that the testator owed debts, beyond all the personal estate which had come to their knowledge, exclusive of that specifically bequeathed, unless the *plantation, slaves,* cattle, &c. in *D.*, were to be considered personal property; that the defendant, *W.*, had been appointed guardian of the person and estate of the infant son of the testator, and had received the rents and profits of the real estate, but they insisted that they were not accountable therefor except to the infant, or without his being made a party. They admitted, that if the plantation, slaves, &c. at *D.*, were to be deemed personal property, or if the real estate at *D.*, or the profits thereof, were to be charged with the payment of the annuity to the plaintiff, under the second will, there was sufficient to pay and secure it to her, but not otherwise, &c., and they set forth a schedule of the debts of the testator.

A witness was examined to prove the laws of *Demarara,* who deposed, that he was born in *D.*, and had resided there a considerable portion of the time, for the last ten years, and, for the last three years, was an officer in the Civil and Criminal Court of Justice of that colony, and was well acquainted with its laws. That by the laws of *D.*, slaves on the plantations are considered as attached to or part of them, and descended and passed with the plantation to the heir, (unless the plantation be duly devised) as real estate. That the same formalities are required to devise per-

sonal as real estate. That he did not consider himself quali- fied to give a correct answer, whether by the laws of *D.*, a will duly executed, becomes revoked by a subsequent marriage and birth of a child. That a will concerning real estate in *D.*, by a person residing in another country, and which was valid to pass real estate by the laws of such country, would be a valid will in *D.*, though not executed with the formalities required there. That by the laws of *D.*, a will must be executed by the testator in the presence of a notary; or in the presence of seven witnesses; or being executed without witnesses, be sealed up and delivered to the secretary or clerk of the Court, who indorses his signature and keeps the will.

The cause came on to be heard on the pleadings and proofs.

*June 19th,*

*Boyd & Riggs* for the plaintiff. They cited *Doug.* 38. *Burr.* 2171. 1 *Equ. Cas. Abr.* 413. 2 *Salk.* 593. note by *Evans.* 2 *East,* 541. 7 *Vesey,* 364. Sir *S. Romilly,* arguendo. 1 *Phillim. Rep.* 469.

*Harison,* contra. He cited, *Amb.* 721. 5 *Term Rep.* 49. 4 *Maule & Selw.* 10. 1 *Phill. Rep.* 469. 2 *Atk.* 267. *Bynk. Observ. Jur. Rom. lib.* 2. *c.* 1, 2. 11. *Poth. Trait. des Donat. Testamen. c.* 6. *s.* 2. 1 *Dodson's Adm. Rep.* 263, *Demarara,* &c.

The cause stood over for consideration until this day.

*August 1st.*

THE CHANCELLOR. (1.) The first question arising upon this case is, whether the will of the 6th of *March,* 1807, was revoked by operation of law, by reason of the subsequent marriage of the testator and birth of a son.

I am not apprized that the question has ever arisen and been decided in the Courts of this state; we are, then, to consider it as a case to be governed by the *English* law, as settled at the time of our revolution, or by those general prin-

1820.

Brush
v.
Wilkins.

Implied re-
vocations of
wills are not
within the sta-
tute of frauds.

Subsequent
marriage *and*
birth of a child
are an implied
revocation of a
will.

And such re-
vocations be-
ing presump-
tive merely,
may be rebut-
ted by circum-
stances.

First deci-
ded in 34
*Car.* II. in *En-
gland*, accord-
ing to the opi-
nion of Sir *J
Nicholl*, (2
*Shower*, 253.)
as to *personal
property*.

Civil law.

Case stated
by *Cicero*.

Pandects.

ciples of reason and justice, which have a uniform and uni-versal application.

It had became a settled rule of law and equity, as early as the year 1775, that implied revocations of wills were not within the statute of frauds, and that *marriage* and *a child*, taken together, (though neither of them taken separately was sufficient,) did amount to an implied revocation, and that such presumptive revocations might be rebutted and controlled by circumstances. Without going minutely in-to all the cases, a cursory view of them will be sufficient to establish this position, and it can be shown to have received continued and unceasing sanction down to this day.

Sir *John Nicholl* says, that this rule was no part of the ancient jurisprudence of *England*, or of any other country, and that *Overbury* v. *Overbury*, (2 *Show.* 253) was the first case in which the rule was applied. That was a case before the delegates, upon appeal, in the 34th of *Charles* II. and it was adjudged that the subsequent birth of a child, was a revocation of a will of personal property; and this decision was expressly founded upon the doctrine of the civilians.

The civil law, in several instances, recognized these im-plied revocations.

The case stated by *Cicero*, (*de Orat. lib.* 1. c. 38.) is of-ten alluded to; in which a father, on the report of his son's death, appointed by will another person to be his heir, and his son returning, the case was brought before the Centum-viri, and the son was reinstated in the inheritance. There is a like case mentioned in the *Pandects*, (*Dig.* 28. 5. 92.) in which the Prince set aside a will made upon a false ru-mour of the death of the person, whom the testator had pre-viously appointed his heir. The decree was made on the peti-tion of the person whom the testator had supposed to be dead; and it was made decidedly on the ground of giving effect to the real intention of the testator—*tamen ex voluntate testan-tis putavit Imperator ei subveniendum.* So, also, the subse-

quent birth of a child unnoticed in the will, annulled it; the doctrine was, *Testamenta rumpuntur agnatione posthumi*; and this is the rule in those countries which have generally adopted the civil law. (*Cic. de Orat.* 1. 57. *Inst.* 2. 13. 1. *Ferriere's Traduc. h. t. Huber. lib.* 2. *tit.* 13. *s.* 5. *de liberis exheredendis,* et *tit.* 17. *s.* 1. *Quibus modis testamenta infirmantur.*) The next *English* case was that of *Lugg* v. *Lugg,* (1 *Ld. Raym,* 441. *Salk.* 592.) decided by the delegates, of whom Ch. J. *Treby* was one, in which it was ruled that marriage and a child amounted to a revocation of a will of personal estate, founded on the presumption of a change in the testator's mind, from the alteration of his domestic circumstances and relations. It appears from the able and elaborate opinion of Dr. *Hay,* in *Shepherd* v. *Shepherd,* (5 *Term Rep.* 51. *note.*) that it had continued down to the year 1770, to be the uncontradicted and settled law of Doctors' Commons, that subsequent marriage and a child amounted to a revocation of a will.

In *Brown* v. *Thompson,* (1 *Eq. Ca. Abr.* 413. *pl.* 15. 1 *P. Wms.* 304. *note by Cox,*) the rule was adopted in the Court of Chancery, by the Master of the Rolls, *Sir John Trevor,* and applied to a devise of real estate. He held, that marriage and a posthumous child, were a revocation of a will of land. This decision was afterwards reversed, on appeal, by Lord Keeper *Wright,* who admitted the general rule; yet held that the case was controlled by the circumstance that the testator had devised his real estate in fee to his future wife, and thereby made provision for the wife, and through her, for his son Mr. *J. Buller.* (5 *Term Rep.* 61.) said, he had examined the register book, as to that case, and discovered the special reason which governed the Lord Keeper, which was, that after the testator's death, the wife had devised to the posthumous son and died, and so there was no injury to any person by the establishment of the will. But he thought, notwithstanding, that the decision at the Rolls

*Margin notes:*

1820.

BRUSH
v.
WILKINS.

English decisions.

was sound, and that the validity of the will ought not to have rested on the subsequent act of the wife.

The application of the rule of the civilians to wills of land, continued long after the case of *Brown* v. *Thompson*, to be a matter of doubt and hesitation in the Courts of law. Lord *Hardwicke*, in *Parsons* v. *Lanoe*, (1 *Vesey*, 189. *Amb.* 557.) cautiously withheld any opinion on the point; and Lord *Northington*, in *Jackson* v. *Hurlock*, (2 *Eden*. 263. *Amb*. 487) said, that the cases did not prove that marriage and the birth of a child would revoke a will of real estate. The distinction, however, between a will of real and personal estate, in respect to this doctrine of presumptive revocations, could not well be supported; and Lord *Mansfield* observed, in *Wellington* v. *Wellington*, (4 *Burr*. 2165.) that as it was settled that marriage and a child were a revocation of a will as to personal estate, he saw no ground of argument why the law should not be the same as to devises of land.

Marriage, and birth of a child, is a revocation of a will of the *real* as well as of the personal estate.

This great question was at length finally and solemnly settled, in 1771, by the Court of Exchequer, in *Christopher* v. *Christopher*, (*Dick. Rep*. 445.) and it was adjudged by Ch. B. *Parker*, and two of his brethren, in opposition to the opinion of Baron *Perrot*, that marriage and a child were a revocation of a will of land. The case of *Spraage* v. *Stone*, (*Amb*. 721.) followed soon after, and the principle received, in that cause, the sanction of the most distinguished judges; and it has stood from that time to this day upon an immoveable foundation. In that latter case, *Spraage* made a will in the island of *Jamaica*, in 1764, devising his real and personal estate. He afterwards married and had a son, and made a second will in *England*, giving all his estate to his wife, but this last will was unattested. The Court of Chancery in *Jamaica* decreed, that the marriage and son, together with the subsequent will, amounted to an implied revocation of the first will, so far only as related to the personal estate, and the first will, as to the real estate, was esta-

blished. On appeal, before the Lords of the Committee, at the Cockpit, consisting, among others, of *De Grey*, Ch. J. of the C. B., Sir *J. E. Wilmot*, late Ch. J. of the C. B., Sir Thos. *Parker*, late Ch. B. of the Exchequer, it was adjudged that the *Jamaica* decree be reversed, so far as it established the first will as to the real estate; and it was declared that the subsequent marriage and a son, were an implied revocation of the whole will of 1764, and that the real estate descended to the son as heir at law.

This whole subject has continued to receive great discussion in the *English* Courts, since the æra of our revolution; and it has led to much refinement, and been accompanied with many distinctions, growing out of new cases constantly arising amidst the endless variety of human affairs. The principle established in the preceding cases has, however, remained perfectly unmoved.

In *Brady* v. *Cubitt*, (*Doug.* 31.) Lord *Mansfield* said, he did not recollect a case in which marriage and a child had been held to raise an implied revocation, where there was not a disposition of the whole estate; and all the judges agreed, in that case, that these implied revocations by a subsequent marriage and a child, might be rebutted by parol evidence. As to this latter point, I apprehend it will be found that the Courts have rather cautiously abstained from any decided opinion as to the admissibility of extrinsic evidence to rebut the presumption of revocation from the circumstance of the marriage and child, and this decision in *Douglas* has been repeatedly questioned. The K. B. in *Doe, ex dem. Lancashire*, v. *Lancashire*, (5 *Term Rep.* 49.) decided, upon very great deliberation, that marriage and the birth of a *posthumous* child, also, amounted to an implied revocation of a will of real estate. This was nothing more than the recognition of the very just and plain doctrine, that a posthumous child had equal rights, and was to be considered in the same situation, with a child born in the lifetime

*Marginal notes:*

1820.

BRUSH
v.
WILKINS.

Observation of Lord *Mansfield*.

1820.

Brush
v.
Wilkins.

Lord *Ken-
yon's* explana-
tion of the prin-
ciple.

of the father.   But Lord *Kenyon* took occasion to observe,
that the foundation of the principle of these implied revoca-
tions was a tacit condition annexed to the will, that the par-
ty does not then intend that it should take effect, if there
should be a total change in the situation of his family.

The subject next came before the Master of the Rolls, in
*Gibbons* v. *Caunt*, (4 *Vesey*, 848.) upon a new state of facts,
and presented a case which had never been decided.
There was a marriage prior to the will, and then the birth
of children, by the first wife, after the execution of the will,
and after the death of the wife, a subsequent marriage and
no children.   Lord *Alvanley* did not say the rule of deci-
sion would be the same, but he observed, that there was not
a single argument that would not apply to the one case as
much as to the other ; and he showed the inclination of his
mind to be in favour of the implied revocation.   But he fur-
ther observed, that " they do go the length of permitting
evidence to be received against those implied revocations,
and that he did not like it ; and Lord *Kenyon*, in 5 *Term
Rep.* did not form his opinion upon it."

A case under a new aspect next presented itself before
Lord *Loughborough*, (5 *Vesey*, 663.) in which the question
was, whether a will was revoked by marriage and the birth
of a child, when the testator had, shortly before the marriage,
by will, given the residue of his estate over, after having pro-
vided an annuity for the person with whom he then coha-
bited, and a large provision for the children he might there-
after have by her.   He then married that person, and had
several children by her.   The Lord Chancellor thought the
case new, and submitted it for the opinion of the Court of
K. B.   This is the case of *Kenebel* v. *Scrafton*, reported
in 2 *East*, 530.   The Court of K. B., after great considera-
tion, decided, that the will was not revoked by the subse-
quent marriage and children, inasmuch as those new ob-
jects of duty were contemplated and duly provided for by
the will.   Lord *Ellenborough*, in delivering the opinion of

Lord *Alvan-
ley's* opinion.

Case before
Lord *Lough-
borough.*

the Court, declared the rule to be settled, that marriage and a child, *without provision made for the objects of these relations*, operated a revocation of a will of lands; but that the rule only applied in cases where the wife and children were wholly unprovided for, and where there was an entire disposition of the whole estate, to their exclusion and prejudice. He approved of the ground of reason on which the doctrine of implied revocations was put by Lord *Kenyon*, and which was not a presumed alteration of intention, but a tacit condition annexed to the will when made, that it should not take effect, if there should be a total change in the situation of the testator's family. Here the wife and children were specifically contemplated and provided for, though under a different character and denomination. And we observe, that in this case, the Court cautiously withheld an opinion on the point, whether the revocation, where there was no such provision in the will, could be rebutted by subsequent parol declarations of the testator in favour of the will.

So, in the case *ex parte the Earl of Ilchester*, (7 *Vesey*, 348.) Lord *Eldon*, with the assistance of the Master of the Rolls, and the Ch. J. of the C. B., held, that a second marriage and the birth of a child, *the wife and children being provided for by the settlement*, and there being children by the former marriage, was a case of exception to the rule, that marriage and a child, operate a revocation of a will.

Another qualification of the general rule is to be found in *Sheath* v. *York*, (1 *Vesey and Bea.* 390.) A widower having a son and two daughters, devised his estate, real and personal, and then married, and had a daughter. The Ecclesiastical Court held the will to be revoked as to the personal estate; but Sir *Wm. Grant* thought that there was no ground to presume the will revoked, as to the real estate, upon any implied condition annexed to it, or upon any presumed change of intention, where the testator had already an heir apparent, and the revocation would be of no use to the subsequent child, who could not take the land. It might

1820.

BRUSH
v.
WILKINS.

Lord *Ellenborough*'s opinion.

Exceptions to the general rule.

Distinction taken by Sir *William Grant*.

be revoked as to the personal estate, for that lets in the subsequent child, but he held, that it was not, in such case, revoked as to the land.

From this review of the cases, it would appear to be a general rule, incontrovertibly established, that marriage and a child, amount to a revocation of a will, either of real or personal estate. There are a number of exceptions to this rule, but not one of them applies to the present case. If the will of 1807 was to prevail, it would be repugnant to the doctrine in every decided case. Here is a total disposition of the whole estate, as respects the child. Here is wanting the accidental circumstance of a provision made by the mother for the child, which weighed with the Lord Keeper, in *Brown* v. *Thompson.* If this will was to prevail, it would be the case of an only child left entirely destitute, and without any provision, under a will of a man of large fortune, disposing of his whole estate. Nor can we derive any circumstance to rebut the necessary presumption of a revocation, from the subsequent unattested will, left in an envelope with the former will uncancelled. The presumption of revocation is increased by the second will, which begins with a declaration, that all former wills were revoked, and which makes provision for this same child, with which the mother was then *enseint.* If declarations of the testator be admissible, in any case, (and they were admitted by Sir *John Nicholl,* in the Ecclesiastical Court,) and if the evidence of circumstances is to be received, (and all the cases seem to agree in this,) here are decided circumstances to show that the testator did not intend to leave his son destitute. I have no hesitation, therefore, in declaring, that the will of *March* 6th, 1807, was revoked by the subsequent marriage, and the subsequent birth of a child.

*It seems that the subsequent birth of a child alone, would not amount to a revocation.* It is unnecessary to consider, in this case, whether the subsequent birth of a child, without the additional circumstance of the subsequent marriage, would have been sufficient to revoke the will; yet I am not willing to quit

this subject, without taking some notice of the late case of *Johnston* v. *Johnston*, (1 *Phillimore*, 447.) decided by Sir *John Nicholl*, in 1817, in the Prerogative Court of Canterbury, in which that Judge, in a very elaborate and learned opinion, reviews all the cases, and adopts the rule of the civil law. He held, that it was not an essential ingredient in these implied revocations, that a subsequent marriage should concur with the subsequent birth of issue; and that the birth of a child, when accompanied with other circumstances, leaving no doubt of the testator's intention, was sufficient to revoke the will of a married man. The case before him was, indeed, enforced not only by the soundest principles of justice, but by the most persuasive equity. When the testator made his will he was married, and had two children living; and his will not only provided for them, but for a third child in *ventre de sa mere*. He lived twenty-two years afterwards, and his property had augmented from 20,000*l.* to 300,000*l.* sterling, and dying suddenly, he left three children, born after the will, wholly unprovided for, and one of the former children swept away the whole, as a residuary legatee. Such a case was almost too strong for any Court of justice, endowed with ordinary moral feelings and perceptions, to resist. He placed the doctrine of implied revocation, not where Lord *Kenyon* had placed it, on any tacit condition annexed to the will, but where Lord *Mansfield*, and (as I think) the civil law had placed it, on a presumed alteration of intention, arising from the occasion of new moral duties, which, in every age, and almost in every breast, have swayed the human affections and conduct. It was not the circumstance of marriage, ( of which the civil law took no notice, in reference to this point,) but the birth of offspring, that laid the true and rational foundation of a presumed alteration of the testator's intention, and which intention constitutes the essence of every will.

It may be questionable, however, whether this last deci-

sion has not carried the doctrine of revocation further than the *English* law will warrant. It appears to be in opposition to the decision in *Shepherd* v. *Shepherd,* already cited, and which was sent out of Chancery by Lord *Camden,* for the opinion of Sir *George Hay;* it was there held that the birth of a daughter and a son, after a former will making provision for the wife, and a child then in *esse,* was insufficient to revoke the will  The general reasoning on this subject, in favour of the revocation, is, that the testator having contracted new relations, such as those of husband or father, he must have intended a revocation of his prior will, because he must have meant to discharge the moral duties attached to those relations.  The claim of the wife to the benefit of this presumption, in the case of a devise of land, is admitted not to be very strong, because, if she was let in, the land would still descend to the heir, and the law has secured to her, in every event, a provision for life, out of the real estate.  Her claim to a provision from the personal estate, rests on higher ground : for, in respect to that portion of her husband's property, she is left entirely at the control of his will and pleasure ; but her pretension is here also weakened, from the consideration of the provision by dower, which the common law has already secured to her. A stronger presumption of the testator's change of mind, arises from the birth of subsequent children ; for, they cannot, like the wife, take care of themselves, by a suitable settlement, nor have they any fixed, unalienable provision, as the wife has, out of the real estate.  They have, therefore, a very strong, natural, and moral claim to a competent support and provision, out of their father's property.

But the answer to this is, that the disposition of property is and ought to be governed by settled rules, and that according to the language and authority of the general current of cases, there must be both marriage and a child, to work a revocation of a will.  It is the policy of the *English* law, to give to every man of competent will and understanding,

.the absolute control (however imprudently or improvidently he may at times exercise it) over the disposition of his estate; and children are not considered as having a legal interest or property in the effects of the father. Our law has rejected, or has never adopted the notion of the *inoffi--ciosum testamentum* of the civil law. It would be dangerous, and might lead to loose speculations, to give greater effect than the settled doctrine of the *English* law has already done, to the occurrence of new domestic duties. Every person is permitted to make his own will, at his discretion; and he may even disinherit his children, if he should be so inclined, whether they deserved, or not, such extreme chastisement. Every material addition to the property of a testator, or alteration in the circumstances of his family, varies his relations and duties, either in kind or degree, and might be made the ground of very plausible and pathetic claims upon the Court for the application of this doctrine of a presumed revocation. Courts would be running the hazard of substituting their will for that of the testator.

Indeed, Sir *John Nicholl* was not inclined to controvert the rule laid down by Sir *George Hay*, in *Shepherd* v. *Shepherd*, (*ubi sup.*) and by the K. B. in *White* v *Barford*, (4 *Maule and Selw.* 10.) that the mere subsequent birth of children, *unaccompanied by other circumstances*, did not amount to a presumed revocation; and it was the concurrence of the other circumstances ·rendering the intention " plain and without doubt," united with the birth of the children, that dictated the decree. If ever such a case, with equally pressing circumstances, should occur here, I should never dissent from that opinion willingly, nor without great difficulty and unaffected regret.

(2.) The first will being thus revoked, and rendered null and void, we have only to deal with this case under the second will, of the 14th *March*, 1809. If the first will be ab-

**1820.**

BRUSH
v.
WILKINS.

*A will duly executed, but revoked by marriage and birth of a child, cannot be connected with a subsequent will not executed with the requisite solemnity to pass real estate, so as to make a valid will; but the estate descends to the heir.*

solutely revoked, there is no pretence for connecting the first will with the second, and holding the latter to be a mere modification of the former, and to be under its influence and control, according to what has been supposed to have been done by Lord *Hardwicke*, in *Brudenell* v. *Boughton*. (2 *Atk*. 268.) That case has no manner of application, and to connect the one will with the other, would be, *mortua jungere corpora vivis*. The first will is absolutely dead, at least, as to every thing that concerns the rights of the wife and child.

The will of 1809 was not executed with the solemnities requisite either by our law, or that of *Demarara*, to pass real estate, and so far the estate descended to the child, as heir at law, subject to the dower of the wife. It cannot admit of a doubt, upon the proof in the case, that the slaves and effects attached to the plantation in *Demarara*, passed as appurtenant to it, and as part of the plantation, to the heir. They, together with the plantation, were real estate, not reached, or affected, by the imperfect will of 1809. The law of *Demarara* on this point, has been proved, as a matter of fact, by a person acquainted with the laws of that place, and who had long resided there, and sustained a judicial office. If he was not a professed jurist, the plaintiff should have furnished more certain proof of the law of *Demarara*. (a) The evidence produced was competent, and, under the circumstances of the case, sufficient, in the absence of all other proof. I cannot judicially know the law of *Demarara*, but by proof, as a matter of fact. The claim of the plaintiff must then be confined to her legacy, under the last will; and the defendants are accountable for the personal estate which has come to their hands as executors, and they are not accountable to any further extent,

*Foreign laws may be proved by witnesses, as matters of fact.*

(a) It was understood in the case in *Dodson*, (1 *Dods. Adm. Rep.* 263.) that by the positive law of *Demarara*, *slaves* on an estate were *glebæ adscriptitii*, or attached to the soil, as part of the realty.

nor as executors, for the proceeds of the real estate, for those proceeds belong to the heir. The annuity given to the plaintiff, was, unfortunately, not made chargeable upon the *Demarara* estate, nor upon any other real estate. Other legacies in the will were chargeable upon the proceeds of the *Demarara* estate, but not the plaintiff's legacy. It is chargeable only upon the personal assets, subject to the debts, and to specific bequests. On this point, the answer of the defendants states, that the debts of the testator exceeded all the personal estate that has come to their hands, or knowledge, exclusive of the specific bequest. If this allegation be true, (and the plaintiff has not alleged or shown any thing against it,) there is no use to the plaintiff in directing an account, for there is a failure of assets, and the bill ought to be dismissed:

1820.

BRUSH
v.
WILKINS.

The following decree was entered:

"It is declared, that the will of the testator in the pleadings mentioned, of the date of the 6th of *March*, 1807, was, in judgment of law, revoked by the subsequent marriage of the testator and the birth of his son. That the will of the 14th of March, 1809, was not executed with the solemnities requisite to pass real estate, situated either in this state, or in *Demarara*; and that the slaves and effects of the testator, attached to his plantation in *Demarara*, descended, together with the said plantation, upon the testator's death, to his son and heir at law, as part of his real estate. That the annuity given by the latter will to the plaintiff, was not charged upon any part of the testator's real estate, and the answer averring that the debts exceeded the assets which have come to the possession or knowledge of the defendants, as executors, exclusive of the specific bequests, and which debts and assets are set forth in schedules annexed to the answer; It *is ordered*, &c. That unless the plaintiff shall, within forty days, elect to have an account taken before a master of the

*Decree.*

personal estate, and of the administration thereof, by the defendants, upon the principles contained in this decree, and the *peril* of costs, in case no monies shall be found due and coming to the plaintiff from the defendants · upon such accounting, the bill shall then stand dismissed without costs."