## In the Matter of the Will of RUDOLPH STERN, Deceased.[*]

Surrogate's Court, New York County, June 22, 1945.

---

[*] See, also, *Matter of Robinson*, 188 Misc. 720.—[REP.

*Benjamin Shiverts* for Hans Kaliski and another, executors, petitioners.

*Harold E. Nagle,* special guardian for Janet E. Stern, infant, objectant.

*Arnstein & Levy* for David Zipkin and another, claimants, respondents.

*Franklyn Ellenbogen* for Alice Canrobert, claimant, respondent.

DELEHANTY, S. Deceased while single made a will under which his mother was his sole beneficiary. Thereafter he married. Sometime later he talked with a college mate, a lawyer, about making a new will. Eventually the latter drew a will substituting the name of deceased's wife as beneficiary instead of his mother. The draftsman reports that deceased at the time of the discussion of the new will said that his wife was pregnant and that he expected her to give birth to a child in the fall. The lawyer friend suggested some reference to children in the will but deceased said he did not want " any fancy wills " and did not want to be charged for his friend's service. He said: " All I want you to do is make a new will which will be a duplicate of this will, except put in Eleanor's name where my mother's name appeared." The draftsman also quotes deceased as saying: " If I do have a child I will get some bonds for the child, but I want my property to go to Eleanor. She is the mother and she is fully capable of taking care of both herself and the child." Eleanor is deceased's wife. After this discussion the new will was drawn and executed on February 15, 1943. The child was born October 1, 1943. At that time a war bond drive was under

way. Deceased bought in the sole name of his child a so-called E Bond in the face amount of $1,000 at one bank and on the same day bought two $100 bonds of the same issue making them payable to the child but alternatively to himself upon her death. The second purchase was made at a bank other than that which sold the first bond to deceased. There is no other evidence of the circumstances attending either purchase nor any evidence respecting deceased's handling of the bonds except that they were still uncashed when he died on February 7, 1944. The bonds cost a total of $900. They were worth no more when deceased died. The estate of deceased is reported to have a gross value of slightly over $37,000. Since his death occurred within four months of the bond purchases it is reasonable to assume that his resources were approximately $38,000 at the time of the purchases. The filed account indicates that deceased owed no debts except his current income tax and rent obligations and a balance in a brokerage account amply secured by collateral. Concededly the will neither provides for nor in any way mentions the child. Concededly, too, no settlement was made on the child unless it be found to have been made by reason of the bond purchases already mentioned.

The special guardian contends that the child was not provided for by any settlement and hence is entitled to a share of the estate in intestacy. He objected to the proof of deceased's comments to his lawyer friend already quoted and objected to proof of statements made by deceased to his mother-in-law after the child was born. The mother-in-law quotes deceased thus: " He showed that be bought bonds for the baby. He wanted to buy bonds for baby  *   *   *  . Yes, he talked about them because it was the conversation he wanted at first an insurance for the baby and then he told me that he bought bonds and showed me especially the $1,000 bond because I never saw that one before."

The rights of the infant depend on the terms of section 26 of Decedent Estate Law. This section is derived from section 49 of article third of title I of chapter VI of part II of the Revised Statutes of 1830 as such section was amended by chapter 22 of the Laws of 1869. The text of chapter 22 of the Laws of 1869 is precisely the same in words and punctuation as section 26 of Decedent Estate Law, with the single exception that the word " lifetime " in the existing statutory text is printed as " life-time " in the text of 1869. The text of section 49 of the stated article in the Revised Statutes is phrased thus: " Whenever a testator shall have a child born after the making of his will, either in his life-time or after his death, and shall die, leaving

such child, so after born, unprovided for by any settlement, and neither provided for, nor in any way mentioned in his will, every such child shall succeed to the same portion of the father's real and personal estate, as would have descended or been distributed to such child, if the father had died intestate, and shall be entitled to recover the same portion from the devises and legatees, in proportion to, and out of the parts devised and bequeathed to them, by such will.''

It is to be noted that the 1830 text related only to a father's will. Such limitation was consistent with section 44 of the same article and with section 1 of article first of the same title and chapter of the Revised Statutes, which provided that the will of an unmarried woman was revoked by her subsequent marriage and that a married woman could not make a will. Between the effective date of the Revised Statutes in 1830 and the date of enactment of chapter 22 of the Laws of 1869 the privilege of making a will had been granted to married women (L. 1867, ch. 782) and it became appropriate to extend the rule respecting partial revocation to the will of a mother. For this reason the text of the statute of 1869 refers to ''parent''. Except in this respect the extant text of section 26 of Decedent Estate Law is the handiwork of the revisers and their views respecting its meaning are of major importance.

The notes of the revisers (Report to Senate, Nov. 2, 1827) show that in their plan for revision of the statutes they had specifically in mind in respect of revocations of wills a line of judicial decisions which, they said, created '' a fruitful source of difficulty and expensive litigation ''. Referring to the case-made law on implied revocations they said: '' It abounds with arbitrary rules and settled refinements, the existence of which none but lawyers would be at all likely to suspect, and which are constantly applied, not to carry into effect, but to defeat the intention of testators. That such is the actual state of the law, has been acknowledged and lamented by the most eminent judges.'' With the case law in mind the revisers said:

'' After this statement of the existing law, that some alterations are not merely desirable, but necessary, the Revisers believe, will be generally admitted. That the provisions suggested by them will meet all the difficulties of a very complicated subject, they dare not flatter themselves; but they affirm with confidence, that if adopted, these provisions will close many sources of expensive and protracted litigation; and that in numerous cases, they will prevent the manifest intentions of testators from being frustrated, by the application of rules apparently

revolting to common sense, and unintelligible to all not versed in the mysteries of feudal learning. The principle which has guided the Revisers in the alterations which they propose, is, that where a change has occurred in the domestic relations of a testator; where new objects, having peculiar and natural claims to his bounty, have come into existence, it is a presumption justified by reason and experience, that his will is intended to be revoked; but that where no such event has occurred, it is equally reasonable to believe, that a will not expressly and plainly revoked, is meant to have effect.

" In conclusion, the Revisers avow their conviction, that a valuable service will be rendered the community, if *those cases* in which, *alone,* implied revocation may be allowed, shall be defined by legislative authority. Experience may indeed discover that the enumeration is defective, and that cases now omitted ought to be included; but should this prove to be the case, the legislature will be competent to apply the remedy. By new enactments, they may supply the defects of the statute of wills, in the same manner as they are accustomed to amend and extend the provisions of other laws. To leave it to courts of justice, however learned and respectable, to declare in their discretion when implied revocations shall be admitted, is to involve the whole subject in doubt and uncertainty. It is to commit to them the power, not of interpreting, but of repealing statutes, and to invest them with an authority paramount to the will of the legislature, and often exercised in direct opposition to the will of the testator." (Emphasis in original notes).

This lengthy excerpt is taken from an original note to the originally numbered sections 54, 55 and 56 of the revision. These were enacted with the section numbers 47, 48 and 49. There was a separate note to the proposed section 56 and its text follows: " New. Whether the birth of a child, after marriage, is a revocation, seems yet a matter of doubt. Vide 4th Johns. Ch. Rep. p. 516, &c. Some legislative declaration seems expedient, and while the consequences of an entire revocation are avoided by the above section, a just provision seems to be made for a probable oversight, as it is placed on the condition that the child is not mentioned or referred to in the will. It is taken substantially from the laws of Virginia, revision of 1819, vol. 1, p. 376; and the same provision exists in most of the southern and southwestern states, and will be found in principle in 1st vol. laws of Massachusetts, p. 94."

The Massachusetts statute to which the just quoted text referred was an act of February 6, 1784, which in section 8 pro-

vided: " That any child or children, or their legal representatives, in case of their death, not having a legacy given him, her or them in the will of their father or mother, shall have a proportion of the estate of their parents assigned unto him, her or them, as though such parent had died intestate; provided such child, children or grandchildren, have not had an equal proportion of the deceased's estate bestowed on him, her or them in the deceased's lifetime."

The Code of Virginia to which the revisers' note referred provided: "But every last will and testament, made when the testator had no child living, wherein any child he might have, is not provided for, or mentioned, if, at the time of his death, he leave a child, or leave his wife enseint of a child, which shall be born, shall have no effect during the life of such after-born child, and shall be void, unless the child die, without having been married and before he or she have attained the age of twenty-one years. When a testator shall leave children born, and his wife enseint, the posthumous child or children, if it be unprovided for by settlement, and be neither provided for nor disinherited, but only pretermitted by the last will and testament, shall succeed to the same portion of the father's estate, as such child would have been entitled to, if the father had died intestate; towards raising which portion, the devisees and legatees shall contribute proportionably, out of the parts devised and bequeathed to them by the same will and testament."

The Virginia Code also took care of the situation existing where a testator made his will after the birth of one or more children but prior to the birth of other children. These after-born children were given an intestate share of the parent's estate just as in the case of a will made before any child was born.

We have one other reference in the revisers' notes to the sources consulted by them. In presenting part II of their revision to the Legislature they said: " The general distribution of the subjects of the whole revision, it will have been perceived, has been made conformably to the admirable system of Judge Blackstone's Commentaries, which is known to have originated with Sir Matthew Hale, and to have been improved by Dr. Wood in his institutes. It seemed to us, that the same arrangement which had reduced to order and system the floating and complicated principles of the *unwritten* common law, must necessarily be sufficient to comprehend the written laws, which are in their nature, merely *supplementary* to that common law. We have, accordingly, applied the same system in detail, to the various acts relating to property, and have therein followed the plan of

the commentaries, with entire conviction that, from the very arrangement itself, no important omission could well occur. It will be seen that the most of the *titles* of the Chapters, and of their subdivisions, are taken from Judge Blackstone's work, and that the arrangement of the text follows, very nearly, the order in which he has treated the subjects included in his first and second volumes. Other subjects, which are entirely of statutory origin, were easily reduced to the same order, and arranged in their proper places. With such high authority, sanctioned as it has been, by the unanimous approbation of all the judges and lawyers in England and in this country, whose opinions have been made public, we felt that we could proceed firmly and securely.''

The latest edition of Blackstone extant in 1827 and the one presumably current in the State of New York while the revisers were at work was the fourteenth edition edited by Edward Christian and published in London in 1803. In Blackstone's text (Book 2, ch. 32, p. 502) he said: '' It hath also been held, that, without an express revocation, if a man, who hath made his will, afterwards marries and hath a child, this is a presumptive or implied revocation of his former will, which he made in his state of celibacy. The Romans were also wont to set aside testaments as being *inofficiosa,* deficient in natural duty, if they disinherited or totally passed by (without assigning a true and sufficient reason) any of the children of the testator. But if the child had any legacy, though ever so small, it was a proof that the testator had not lost his memory or his reason, which otherwise the law presumed; but was then supposed to have acted thus for some substantial cause: and in such case no *querela inofficiosi testimenti* was allowed.'' And the revisers no doubt were familiar with the provisions for marriage settlements for a copy of one was to be found in the appendix to Blackstone's Book 2 on appendix pages iv-xii.

Reverting to the special notes to the revisers' proposed section 56 it will be seen that they directed the attention of the Legislature to the case reported in 4 Johnson's Chancery Reports at page 516. The case is *Brush* v. *Wilkins* (4 Johns. Ch. 506–522). The opinion of Chancellor KENT contains on page 516 a discussion of the particular point which the note to proposed section 56 discusses. The Chancellor in pages 509–519 analyzes a number of English cases and in substance says that there was to his knowledge no American authority on the subject of implied revocation. He traced the principle

of revocation to the civil law and respecting it said (p. 517):
" It was not the circumstance of marriage, (of which the civil law
took no notice, in reference to this point,) but the birth of off-
spring, that laid the true and rational foundation of a pre-
sumed alteration of the testator's intention, and which inten-
tion constitutes .the essence of every will." The Chancellor
(p. 518) discussed the relative claims of a surviving spouse
and of surviving issue saying: " A stronger presumption
of the testator's change of mind, arises from the birth of
subsequent children; for, they cannot, like the wife, take care
of themselves, by a suitable settlement, nor have they any
fixed, unalienable provision, as the wife has, out of the real
estate. They have, therefore, a very strong, natural, and
moral claim to a competent support and provision, out of their
father's property."

The notes and the case just referred to make it clear that
the legal profession and the judiciary were dealing with the
problem of implied revocations as involving both marriage
and birth of issue. This makes it pertinent to note the history
of section 35 of Decedent Estate Law which deals with the
subject of revocation by marriage. This section of our Dece-
dent Estate Law has its roots in section 43 of the same article
of the Revised Statutes which has been under discussion in this
decision. It is particularly pertinent on the question now before
the court because in it is contained a statutory rule of evidence
bearing upon the admissibility of the testimony as to this
deceased's intentions. The text of what eventually became
section 43 of the Revised Statutes was originally proposed
with the section number 50 and to that original section there
was appended a note which again referred to the case of
*Brush* v. *Wilkins* (*supra*). After declaring their intention to
state every circumstance which ought to be admitted to repel
the presumption of revocation the revisers stated: " Whether
parol evidence is admissible to rebut the presumption, is
doubted by Chancellor Kent in the case referred to; but
its admissibility seems to be established by recent decisions
in England. Such evidence, in cases of this sort, must always
be dangerous, and is therefore excluded by the revisers. Some
legislative provision on the subject seems necessary for the
settlement of the law, and for general information." Having
thus in mind the refinements of the English cases and the
doubts as to the admissibility of evidence before them the
revisers stated the rule as to revocation and the rule as to
evidence of it in the text which became eventually section 43

of the Revised Statutes. That text is: "If after the making of any will, disposing of the whole estate of the testator, such testator shall marry, and have issue of such marriage, born either in his life-time or after his death, and the wife or the issue of such marriage shall be living at the death of the testator, such will shall be deemed revoked, unless provision shall have been made for such issue by some settlement, or unless such issue shall be provided for in the will, or in such way mentioned therein, as to show an intention not to make such provision; and no other evidence to rebut the presumption of such revocation, shall be received." That text remained undisturbed for ninety years and until its amendment by chapter 293 of the Laws of 1919. The amendment of 1919 changed the structure of the section so as to make the revocation partial rather than absolute and so as to make express provision that the surviving spouse or issue should have an intestate share. No change in substance was made in the statutory rule of evidence. The next change in the section was made by chapter 562 of the Laws of 1931. This change interpolated the provision now in the section authorizing recovery of the intestate share from the devisees and legatees proportionately. The amendment was proposed by the Commission to Investigate Defects in the Law of Estates. In the next year the commission proposed a further amendment and by chapter 459 of the Laws of 1932 the section was established in its present form and by its terms was made effective only in respect of wills executed prior to September 1, 1930. In the final amendment the words "some settlement" were substituted by the words "an ante nuptial agreement in writing" and the rule of evidence was even more sharply limited so as to permit proof only of such antenuptial agreement.

Though a subsequent Legislature cannot interpret the text of an earlier legislative act it is not without significance that the 120 years which have passed since the revisers spoke have witnessed only restrictive legislation on the subject of parol evidence in this field. Whether the revisers had fully understood the English authorities extant in their day may be doubted in the light of a review of such authorities had in 1838 in the case of *Marston* v. *Roe* (2 N. & P. 504; 112 Eng. Rep. 742). An appellate tribunal which was comprised of all the judges of England except Lord DENMAN analyzed the English law on the subject of revocation because of marriage and the birth of issue and on the point here under consideration said

(p. 532): '' The broad question, therefore, which has been argued between the parties has been, whether evidence of the testator's intention, that his will should not be revoked, is admissible to rebut the presumption of law, that such revocation should take place? And we all concur in the opinion, that the revocation of the will takes place in consequence of a rule or principle of law, independently altogether of any question of intention of the party himself, and consequently, that no such evidence is admissible.'' The English case commented on the difficulties which would be involved in receiving proof of intention not to revoke and said that the reception of such evidence of oral declarations in favor of revocation would require the receipt of proof of many changes of mind of the testator which in turn would present the puzzle which of the intentions so proved would '' be allowed to predominate?'' The English court ruled definitively that all evidence of oral declarations of intention was inadmissible.

The considerations which motivated the English judges in reaching the conclusion to exclude declarations of intention respecting a testamentary paper are of like controlling force in this jurisdiction. In *Matter of Kennedy* (167 N. Y. 163) the court had before it the question whether declarations of a testator were receivable to establish that a missing will had not been revoked. The Court of Appeals stated the point thus (p. 170): '' The principle involved in the question, therefore, is whether the oral statements or declarations of a party before death are admissible to establish a testamentary disposition of property.'' The court continued: '' The whole course of legislation in this state from the earliest times to the present day, concerning the execution and revocation of wills, discloses a clear purpose to substitute in all cases written for oral proof of a testamentary disposition of property and to sweep away all parol proof of testamentary intentions, and, hence, to exclude statements or declarations of the deceased.'' The court discussed the early law of wills of this state and then said (p. 171): '' It is perhaps not surprising that in the evolution of the law of wills and the change from unwritten to written evidence of testamentary intentions, some of the usages and traditions existing during the period when unwritten wills were valid should survive. But in this state, at least, it seems to us that the courts have applied the rules of evidence with regard to oral declarations concerning testamentary intentions in such a manner as to conform to those general and sweeping changes in the statute law, which were

intended to substitute written for unwritten evidence in establishing testamentary dispositions of property."

The declarations of deceased offered here were necessarily intended as proof of testamentary intentions just as was the excluded proof in *Matter of Kennedy (supra)*. The effort in the *Kennedy* case was to show by parol that no revocation by physical destruction was accomplished by the testator. In the present case the effort is to show that no revocation occurred by operation of section 26 of the Decedent Estate Law, since deceased orally indicated a contrary intent. Since the oral proof was offered in an effort " to establish a testamentary disposition of property " it may not be received and the motion to strike it from the record is granted.

The remaining proof in the case is constituted of the filed account and of the information that deceased paid $900 for bonds which he caused to be issued in the name of his two-week-old child. Whether the purchase of the bonds in that form without more (and nothing more is shown) gave the child title to the bonds may be questioned. The court however assumes for the sake of this discussion that the child was benefited to the extent of $900. The court holds that such benefit was nothing more than the natural expression of parental joy on the part of deceased over the birth of his daughter and that it was not intended to be a provision for her future maintenance and support and was not any " settlement " upon her.

This finding of fact suffices to dispose of the point at issue but the court should add that the proof failed as matter of law to establish the making of a settlement on his child by deceased. In the setting of the Revised Statutes the word " settlement " had definite reference to the type of written agreement by which wives and issue were assured maintenance after the death of a husband and father. When the revisers drafted the statute under consideration married women were classified with infants, persons of unsound mind and idiots in a group incapable of making wills of real estate (Rev. Stat. of N. Y., part II ch. VI, tit. I, art. first, § 1) and were also held incapable of making a will of personal property (Rev. Stat. of N. Y., part II ch. VI, tit. I, art. second, § 21). Even as respects property which she owned as a feme sole a wife had to resort to courts of equity for the enforcement of a proper maintenance for herself and her children against the creditors of her husband. The children, as Chancellor KENT pointed out in his Commentaries, could be wholly dis-

inherited by an unjust father and the community could do nothing about it. As a consequence of the limited property rights of a married woman it was the common practice that parties possessed of substantial means who were intending to marry would enter into a marriage settlement which provided both for wife and prospective children. Such agreements were of necessity in writing and involved the creation of an obligation enforcible under the agreement by the beneficiaries in whose favor it was executed. Since the procedure came to America from England, an English definition is pertinent. " A settlement may be defined as any disposition of property, real or personal, by any instrument or number of instruments, for the purpose of securing that the property comprised in the settlement shall be enjoyed by persons in succession, and in particular of regulating the enjoyment of the settled property among the persons or classes of persons nominated by the settlor.* * * Among familiar kinds of settlements are those sometimes referred to as * * * ' marriage settlements ' * * *." (29 Halsbury's Laws of England [2d ed.], p. 528, §§ 770–771). In American practice the word is defined by the Supreme Court of Ohio in *Rhodes* v. *Weldy* (46 Ohio St. 234) where the court had under consideration a statute quite similar to ours. The court said (p. 242): " A settlement at once suggests the intervention of trustees upon whom is conferred a fund or property in some form, which constitutes a source of maintenance, education, etc." That the word " settlement " meant a writing when used in section 35 of the Decedent Estate Law is established by authority (*Matter of Snopek*, 249 App. Div. 396, 399, affd. 275 N. Y. 606). There can be no dispute that the word " settlement " means the same thing in section 26 as it meant in section 35 and so to be effective as a bar to the statutory revocation the so-called " settlement " must be in writing. It follows that an outright gift by a parent to an after-born child does not meet the condition stated in the statute and is wholly ineffective to deprive the child of his intestate share. And it is right that this should be so. The right which the statute secures is a right of inheritance from the *deceased parent,* not an expectancy of inheritance from a living parent who might remarry and have additional issue to whom she would owe the same obligations as to a child by a first marriage. The history of the statute outlined herein makes it abundantly clear that the purpose of the revisers was to exclude oral evidence of testamentary intentions and oral evidence of

testamentary dispositions as well. Only a writing meets the test of the statute.

This concept of the purpose and effect of the revision brings into view another aspect of the problem which requires discussion. The case of *Marston* v. *Roe* (*supra*), to which reference has already been made confirmed for the English courts a principle of law which had been stated long before in *Doe d. Lancashire* v. *Lancashire* (5 Durm. & E. 49, 58, 59). In the last-cited case Lord KENYON said that the revocation because of birth of issue was due to a " * * * tacit condition annexed to the will itself " when made, that it should not " take effect if there should be a total change in the situation of [the testator's] family." Referring to this principle in *Marston* v. *Roe* (2 N. & P. 504, *supra*) TINDAL, C. J., said that there was no basis to the argument there made that an after-born child's right of inheritance in property not operated on by the will because acquired later than its date constituted a provision for the child and thus prevented revocation. Continuing on the point the court said (p. 539): " * * * And, indeed, such a proposition seems incompatible with the nature of a condition annexed to the will, which, *so far as it relates to the existence or extent of the provision, must in its nature have reference to the existing state of things at the time the will itself was made.*" (Emphasis supplied.) This principle of the English cases has been held in *Matter of Del Genovese* (169 App. Div. 140) to have been written into the Revised Statutes. In the cited case the court said (p. 144): " Under our statute marriage and parenthood do not raise a presumption of an intention to revoke, but are in themselves a revocation, unless express provision be made in view of the new duties arising from the changed relation.

" After much deliberation it has been settled that the rules applicable have reference to *the existing state of facts at the time the will itself was made.*" (Emphasis supplied.) This appellate holding has undoubtedly gone unnoticed by many courts of first instance which have held that provisions made after the birth of issue may constitute a settlement. This court deems itself bound to follow what it conceives to be the law stated by appellate authority.

Only the law so stated is consistent with the history of the statute and with the legal principles which the statute codified. The rule so stated is the only one consonant with our Statute of Wills. It is of course settled law that a nontestamentary extraneous instrument may not be incorporated into a will

by reference. It may be resorted to for the limited purpose of ascertaining the identity of a beneficiary *but it can never be used as a testamentary disposition*. It must be clear on reflection that any use of conduct of a testator *after* the date of his will and any use of a nontestamentary instrument of later date as bases to decision of the question whether the statutory revocation is effective or ineffective constitutes a use of such conduct or such instrument *as a testamentary disposition*. The considerations outlined in *Matter of Kennedy* (167 N. Y. 163, *supra*), forbid such use of oral statements; and a writing (not sufficient as a testament) is in no different case. The statute effectively limits the inquiry as to provision for the after-born child to provision made in the instrument itself or to provision made in a written agreement *contemporaneous with or prior in date to the will.*

The statutory scheme attaches a condition to the will of the testator unless either of three states of fact exist *at the date of the will*. If either of such states of fact exist there is *no* condition attached to the will. If none of the three exist the condition attaches and becomes operative at once upon the birth of issue without regard to anything a parent may do after the date of the will. Under the statute the inquiry by the court must be limited to an ascertainment of the facts existent at the date of the will and at no other date. If at that date the will makes mention of after-born issue or if at that date provision for after-born issue is contained in the will no condition attaches to the will. Inspection of the will itself necessarily discloses whether or not either of these states of fact existed at the date of the will. If such inspection of the will discloses that there is no mention in it of after-born issue and no provision in it for such issue further inquiry is limited to ascertainment whether there is provision for the child *outside the will* by way of written agreement. If *at the date of the will* the terms of the will neither mention nor provide for after-born issue and no settlement agreement in writing providing for after born issue then exists, there is a tacit condition attached to the will by the statute. If thereafter a child is born to the testator the statute operates to give to the after-born child a statutory legacy equal to an intestate share in the testator's property. The statute in effect says to a prospective testator, whether married or single and whether with or without issue, that he may make a will freely and unconditionally if in it he provides for or

mentions after-born issue or if at its date he has by written agreement so provided for after-born issue. The law further says to the prospective testator that if he make a will without such mention or such provision in or outside the will, there is attached to his will a condition that if thereafter issue shall be born to him who shall survive him, his will is not operative as to such issue.

It is impossible under our system of regulating the execution of wills to conceive of a revocation which is merely tentative and which must be held in suspense to await ascertainment of what the testator may do between the date of his will and the date of his death. An already existent revocation cannot be rescinded and a will partially revoked cannot be republished so as to be effective according to its tenor by reason of any act of the testator or any speech of his or any writing of his (other than a testament) after the date of the instrument which is partially revoked perforce the statute. If we look only at the conditions existent at the date of the will and permit nothing of subsequent date to be considered we are preserving intact our scheme of disposition of property by written wills. If we accept any conduct or writing postdating the execution of the will as operating to republish the will and to make its terms effective we would engraft upon our Statute of Wills an exception having no warrant either in the history or in the text of the statute regulating implied revocations.

For all the reasons stated the child of deceased is held to have an intestate share in his estate.

The court approves the settlement at $350 of a disputed claim. The compensation of petitioning attorney is fixed at $1,250. No costs are to be taxed.

Submit, on notice, decree settling the account accordingly.