## SHERRY *vs.* LOZIER.

### *In the matter of proving the last Will and Testament of* DAVID SHERRY.

As to wills executed before the Revised Statutes went into effect, by a testator who was living at the expiration of a year after the Statutes went into effect, the provisions of the Revised Statutes relating to *revocations*, are applicable only in respect to revocations made subsequent to that time. Those provisions were prospective and not retrospective, and cannot be applied so as to invalidate a previous revocation, good at the time it was made, but not conformable to the new provisions.

A revocation of a will, in writing, may be executed with the same formalities with which the will itself was required by law to be executed.

A will of real or personal estate made before the Revised Statutes, might be revoked after the Statutes went into effect, by a writing executed with the same formalities as were requisite by law to the execution of a valid will, at the time the will was made.

A will of personal estate before the year 1830, might be valid, though not authenticated by an attestation, or by the subscription of the testator; and a revocation of such a will made since 1830, might be effective, though not so authenticated or subscribed.

A will of personalty executed in 1813, held not to be revoked by a writing of the decedent made in 1849, the latter not purporting in terms to revoke the will, and not being a valid disposition of the personal estate.

By the rule of the Ecclesiastical and Common Law, a subsequent marriage, and the birth of children, were sufficient to establish the revocation of a will, by presumption of law, and this presumption could not be rebutted. The subsequent birth of children, in connection with other circumstances, also operated as an implied revocation; this presumption, however, could be rebutted.

The decedent being a seaman, in 1813, executed at a shipping office in the city of New-York, a will giving all his property to his wife. He at the same time made a power of attorney, authorizing her to collect his wages. At the time, he was married and had two children, one of whom survived him; and he subsequently had five other children, three of whom were living at his death. He was then in very moderate circumstances, but subsequently became possessed of a large estate. In 1849, he drew a paper writing in the form of a will, but left unfinished and unexecuted, in which he stated that *it was time to make some distribution of what he possessed.* The will of 1813, and the power of attorney, were preserved together in the same wrapper in his desk, where they were found at his decease :—

Held that the will of 1813, was revoked by implication or presumption of law, derived from the peculiar circumstances attending its execution, the alteration in the decedent's affairs and state of his property, the subsequent birth of five children, and other facts favoring the same conclusion.

J. LEVERIDGE, *for Executrix.*

I. The evidence is sufficient to establish the paper as a will.

It cannot be presumed from the lapse of time, that the witnesses can recollect all the facts and circumstances that transpired at the time of the execution of it. Their testimony is sufficient to establish its due execution.

II. The paper is not defective as a will of personal estate.

No emergency is referred to upon which the will is to take effect.

Nor is there any condition annexed or referred to.

III. The will is not revoked as to real estate, nor as to personal estate by the instrument of 1849.

1. Because there is no revocation or attestation clause. It does not name executors. It is an unfinished paper. It shows a suspended mind: that something more was to be done to perfect it. It is not signed. (3 *Mod.*, 258; *Noticed in* 7 *Vesey*, 397; 14 *Massachusetts*, 208.)

The instrument of 1849 does not come within the case of *Watts' & Le Roy* vs. *Public Administrator*, 1 *Paige*, 347. In that case there was every requisite except signature; see the case of Catharine Lloyd's will, mentioned in note to 4 *Vesey*, 200, and James Savage's will in same note, and referring to a case cited by *Roberts*, *p.* 198.

2. Although the name of testator is in the beginning of the instrument of 1849, yet that has been held not a signing, which purports that there is to be a further act.

3. If the instrument of 1849 cannot take effect as a

revocation of the will, on account of some defect, then no matter what its provisions are, they can have no application to the will.

4. It is not pretended that the revocation was by burning, tearing, or obliterating, and it therefere does not come within the numerous class of cases decided upon those points. Yet it is contended that the same was revoked :

1. By presumption that an instrument properly executed, and which has been lost or mislaid, once existed.

Where is the evidence to sustain this ?

2. Presumption cannot be resorted to in opposition to express directions of the statute.

IV. Birth of children after making of will is not a revocation. (2 *Vol. R. S., p.* 9, § 49.) It lets in after-born children, to such portion as would have descended or been distributed to such after-born children, had the father died intestate. Children born before making of will are deprived of their portion.

V. When the Legislature has prescribed certain modes for the revocation of wills, it is not competent for the Court to pronounce that a will has been revoked when the positive requirements of the Legislature have not been complied with. (*R. S.,* 2 *Vol., p.* 12, § 76.)

A. L. ROBERTSON, *for Heirs and next of kin.*

I. The paper of 1813 was defective as a will of personal estate. It was incompleted, the emergency of his shipping as a man-of-warsman not having occurred. (*Nicholls* vs. *Nicholls,* 2 *Phil.,* 180.)

II. It was defective as a will of real estate.

1. There is no evidence of its publication as a will.

(*Cruise Dig. Tit. Devise*, 38, *c.* 5, § 43; *Signed, sealed, and delivered, see Laws of* 1813; *Powell on· Devises, by Jarman,* p. 90; *Ross* vs. *Ewer,* 3 *Atk.,* 161; *Dr. Spilsbury* vs. *Burdett,* 6 *Man. & Gr.,* 386; *Brinkerhoff* vs. *Remsen,* 8 *Paige,* 488; *British ·Museum Trustees* vs. *White,* 3 *M. & P.,* 703.) The attestation is not evidence of it. (*Hands* vs. *James,* 1 *Comyn,* 531.)

2. There is no evidence of its having been signed by the witnesses· in presence of the testator. (1 *Jarman on Wills,* 74; *Hands* vs. *James,* 1 *Comyn.,* 531; *Price* vs. *Smith, Willes,* 1; *Croft* vs. *Pawlett,* 2 *Str.,* 1109; *S. C.,* 8 *Vin. Ab.,* 128; *Lord Radcliff* vs. *Lady Parkyn,* 6 *Dow,* 202.)

III. It was revoked by the instrument of 1849, so far as the personal estate was concerned.

1. The latter was a will in writing, executed with the same formalities as the will of 1813. (2 *R. S.,* 64, § 42; *Id.,* 68, § 69; 1 *Paige,* 347; *Roberts on Wills, Vol. I.,* p. 107.

2. It was entirely inconsistent in its dispositions with the former. (3 *Mod. R.,* 206; *Goodright* vs. *Glazier,* 4 *Burr.,* 2512; *Harwood* vs. *Goodright, Comp.,* 92.)

IV. The decedent must be presumed to have actually revoked, by a proper instrument now lost or destroyed, the will· of 1813.

1. Such presumptions may be made. (*Betts* vs. *Jackson,* 6 *Wend.,* 173; *Knebel* vs. *Sorafton,* 2 *East.,* 530; *Best on Pres. of Law & Fact,* p. 12.)

2. Circumstances occur to give rise to it.

1. Character of instrument and cause of execution.

2. Preserved accidentally with a power of attorney equally useless. Mrs. Sherry never used it.

3. It devised real estate, of which he had none: was never republished before 1830, and since then, it would

have passed real estate, which it is evident he meant to give to others. (2 *R. S.*, § 70 ; *Will of* 1849.)

4. The law of 1830 would have taken away part of the estate given in 1813, and given it to some children, and left others, equally meritorious claimants, unprovided for. (2 *R. S.*, 65, § 49.)

5. Change of the testator's circumstances, particularly in regard to the real estate, wife being an alien.

6. Declarations to various persons.

7. Language of will of 1849.

8. Reading that will to wife and stepdaughter. No evidence of ever recognizing former will.

V. The subsequent birth of children and accompanying circumstances, operated as an implied revocation.

1. The birth of children is the principal ground for implying revocation. (*Recital of Stat.*, 32 *Hen. VIII., c.* 1 ; 1 *Denio, p.* 27 ; *Pitt* vs. *Pelham, exr. Freem. C. R.*, 134, *Lord Nottingham* ; *Eyre* vs. *Eyre*, 1 *P. Wms.*, 304 ; *Mantin* vs. *Roe, exr. Fox*, 8 *Ad. & El.*, 61, *Ch. J. Tindal* ; *Overbury* vs. *Overbury*, 2 *Show*, 242, 34 *Car. II.*)

2. Such presumption is of the happening of an implied condition, and all subsequent facts may be examined down to the death of the decedent. (*Marston* vs. *Roe, exr. Fox*, 8 *Ad. & El., p.* 55, 60 ; *Israell* vs. *Rodon*, 2 *Moore, P. C. C.*, 51.)

3. If it be of a mere implied revocation, the circumstances are sufficient.

1. Change of circumstances.

2. Continued affection.

3. Repeated declarations.

4. Instrument of 1849.

5. Unexpected death. (*Johnston* vs. *Johnston*, 1 *Phil.*, 447 ; *Gibbens* vs. *Cross*, 2 *Add.*, 455.)

THE SURROGATE. In December, 1813, David Sherry executed an instrument, of which the words in italics were in writing, and the remainder printed as follows :—

"In the name of God, Amen. I, *David Sherry, seaman,* being of sound mind and memory, and considering the uncertainty of this frail and transitory life, do, therefore, make and ordain this my last will and testament, that is to say, First, after all my just debts be paid and discharged, I give and bequeath, *unto Joanah Sherry, all my real and personal property ;* Likewise I make and ordain the said *Joanah Sherry* to be sole execu*trix* of this my last will and testament, hereby utterly disallowing and revoking all former wills by me made. In witness whereof, I have hereunto set my hand and seal, the 14*th* day of *Dec.,* in the year of our Lord one thousand eight hundred and *thirteen.*

DAVID SHERRY. [L. S.]

Signed, sealed, and delivered by the said *David Sherry,* as his last will and testament, in the presence of ·

CHARLES F. MOULTON,
SAMUEL C. REID,
SAMUEL FREEMAN.

On the same day Mr. Sherry executed a power of attorney, a printed blank, filled in, in writing, constituting his wife, Joanah Sherry, his attorney to receive and recover all debts and demands due to him, and all moneys to become due " *on account of wages.*" This instrument was signed and sealed in the presence of Charles F. Moulton, who became subscribing witness to it, as well as to the will. At the time of this transaction, Mr. Sherry was married, and had two children, one of whom has since died. He subsequently had five other children, three of whom were living at his decease in May, 1850. In the will of 1813, he is described as a "seaman," and it ap-

pears from the testimony of Captain Reid, who was a witness to the will, that he had been in the pilot service, and when the war broke out, his functions ceased pretty much, and he then went to sea. The mode of the execution of the will is in harmony with this idea. Charles F. Moulton, one of the witnesses to the will, who was at the time clerk in the office of Williams a notary public and shipper of crews, and extensively engaged in that business, states that at times they had half a dozen ships' crews to ship in a day, varying from ten to thirty men ; that for privateersmen they sometimes drew thirty wills a day ; that where persons had wives and families, they generally drew a will and power of attorney together. He also says, that the will and power produced in evidence, and signed by Mr. Sherry, were filled in by him ; he has no doubt they were signed at the same time, as was the custom ; " they must have been prepared at the same time, because they went together, will and power, for married men ;" " it was the custom where married men were shipped, and left a power, to accompany it with a will, both in favor of the wife."

The will and the power appear to have been kept together till the death of Mr. Sherry, in a portable writing desk, containing bonds, mortgages, and valuable papers. They were placed under the other papers, at the bottom of the desk, and according to Miss Brooks' statement, wrapped " in a piece of old-fashioned brown paper as an envelope ;" but Mrs. Sherry denies that there was any wrapper about them, and says the will was " always loose," and " the power inside of it." Miss Brooks also states, " *I never opened it.* Once my father opened it in my presence to show me what it was ;" again, "I never opened the will, my curiosity was not so great ;" again, " some time when the desk was open, I took up the will, supposing it to be an old indenture of one of the boys ; this was some six or eight years ago. This was not the first time I saw it. Father was by. I had seen it before in the same

desk. I had seen the inside of it before. I did not read it when I saw it before. I knew it was the same paper. When I saw it before, I knew it was not an old indenture. There were indentures of the boys in the desk. The outside of the indentures resembled the will. My father had had it out, folded it up, and laid it down on the desk without the envelope. The paper had been around it before when I saw it. I thought it was an old indenture, because it had no envelope around it. I had seen it often in the desk before that, and knew it to be there in the desk. When I saw it six or eight years ago, I took it up, and father told me to put it down, and I did so. When before that time I saw it, I had seen it in and out of the envelope, both. My father never read the will to me. When I saw it before, *I opened it,* and read part of it."

I think it appears sufficiently in evidence, in the absence of any contradictory testimony, that the circumstances of the decedent at the date of the will were very moderate. He was subsequently, for many years, a pilot and a harbor master, acquired a handsome competency, and died possessed of real and personal estate, valued at about forty thousand dollars.

The parol declarations of the decedent offered in proof as evidence of testamentary intention, are very unsatisfactory, vague, and uncertain, and cannot have any material influence upon the case.

After Mr. Sherry's death, a paper in his own handwriting, was found in a pocket-book in his business coat pocket, which Miss Brooks says she saw in his hands about eight months before his death, on which occasion he read it aloud to her mother and her.

It is in the following words :—

" *New-York,* July 26, 1849.

This is to certify that I, David Sherry, of the city of New-York, residing at No. 137 Eldridge Street, in my 69. year of age, I think it is time to make some distribu-

tion of w(h)at I possess in this world, as the uncertainty of life at this time when the cholera prevails to such an extent.

In the first place, I leave to my wife all my real and personal estate as long as she remains my widow. At her death, I leave to my stepdaughter Maria Brooks, the sum of ten thousand dollars, $10,000, as long as she lives, it to be kept at interest, at her death she is to leave it to my grandson, John Sherry, the said Maria to take the whole charge and care of his schooling, and see that he is properly brought up.

In the second place, I leave to my daughter, Jane A. Sherry, the house and lot No. 137 Eldridge Street, and ten thousand dollars, $10,000, and at her death, it is my wish that she would leave what she has among my grandchildren, as many as she likes."

One prominent feature in this case consists in the peculiar circumstances under which the will was made. It was executed at a shipping office, in connection with a power of attorney to receive wages, and the will and the power were kept together until the death of the decedent. For the purpose of protecting sailors from the influence, fraud, or imposition of agents, or other persons, the statutes of 9 & 10 *Wm. III.*, c. 41, § 6 ; 5 *G. III.*, c. 60, § 4 ; 11 *G. IV.*, *and* 1 *Wm. IV.*, c. 20, provided that no will of a seaman " contained, printed or written in the same instrument, paper, or parchment, with a warrant or letter of attorney, shall be good or available in law to any intent or purpose whatsoever." Under the statute it was held at an early period, that the will was invalid, though not embodied in the *same instrument* with the power of attorney ; and there have been numerous decisions since, that the will of a seaman executed as security for a debt, is invalid, and does not operate as a testamentary disposition of the whole property. (*Zacharias* vs. *Collis*, 3 *Phill.*, 176.) . This statute has not been enacted in this State, and I only advert to it and the decisions made under it, for the purpose of show-

ing that sailors' wills have been considered in some respects exceptions to the rules applicable to ordinary cases, not indeed in the words of Sir John Nicholl, "exceptions to the great fundamental principles of all testamentary dispositions, *the intention of the testator*, but to some of the rules and presumptions by which the *real intention* is to be *ascertained*."

It is manifest this will was made on a special occasion, on the eve of a departure or expected departure to sea, and in connection with a power for the collection of wages. These circumstances are, in my judgment, of much importance in the determination of the questions to be resolved. The will was made in 1813, and was over sixteen years old when the Revised Statutes went into operation. Formally speaking, it was executed with the solemnities requisite to pass real and personal estate; for though there is no direct proof that the witnesses signed in the presence of the testator, yet, after a great lapse of time, that may be presumed. It does not appear, and is not likely that the decedent owned any real estate at the time, nor is it material on the probate of the·instrument, to inquire how its construction may be affected by the section of the statute declaring that every will devising in express terms all the testator's real estate, shall be "construed" to pass all he was entitled to devise at the time of his death. The principle if not the only topic of dispute, is, whether it was revoked at the time of the testator's death. The Revised Statutes prescribed how wills shall be executed and revoked, and the application of these provisions to wills previously executed, is subsequently declared in §§ 91, 92, 2 *R. S.*, *3d ed.*, *p.* 133, as follows:—

·§ 91 (original § 76). "The provisions of this title in relation to the revocation of wills, shall apply to all wills made by any testator who shall be living at the expiration of one year from the time this chapter shall take effect."
§ 92 (original § 77). "The provisions of this title shall not be construed to impair the validity of the execution of any

will made before this chapter shall take effect, or to affect the construction of any such will."

The scope and purport of these sections is simply to sustain the validity of a previous will validly executed; to apply to the question of valid execution, the law as existing at the time of the execution; and *e converso* in regard to the revocation of wills already executed, to apply the new provisions of the statute to all wills then in force, in case the testator lived a year after that chapter went into effect. If the testator died within the year, he might revoke his will under the previous law; if he survived the year, he could only revoke it under the new law. The 34th Section 2 *R.*, *S.*, *p.* 124, 3*d* ed., is entirely consistent with this view, in declaring that a revocation in writing shall be " executed with the same formalities with which the will itself was required by law to be executed." All these provisions were prospective, and regarded future acts. The 34th Section is certainly prospective, " No will in writing, &c., *shall be* revoked;" and the 91st Section applies the provision to " wills made by any testator who shall be living at the expiration of one year;" so that reading the two sections together, the sense would run thus: " No wills made by any testator who shall be living at the expiration of one year from the time this chapter shall take effect, *shall be* revoked or altered, otherwise than by some other will in writing, or some other writing of the testator declaring such revocation or alteration, and executed with the same formalities with which the will itself was required by law to be executed." It certainly could never have been designed to give the new statute in regard to revocation a retroactive effect, so as to revive a will revoked and dead at the time the statute went into operation, because the revocation, which though good under the law as it then stood, was not conformable to the law as thereafter altered. I am very clear that the true and reasonable construction of the section, leads to the application of the new system of revocations to all wills

then legally extant, in case the testator survived the year, and relates only to future acts ; that it can have no retrospective effect, so as to invalidate a previous revocation good at the time it was made and consummated, or to bring up a revoked will out of its grave, and give it new vitality.

It follows, that if this was a valid and subsisting will in 1830, it could only be revoked thereafter by the testator, in a mode conformable to the requisitions of the Revised Statutes. The counsel for the contestants urges that it has been so revoked as to personal estate, by the instrument in the handwriting of the testator, dated July 26, 1849, which it is contended was " executed with the same formalities with which the will itself was required by law to be executed" at the time it was made. Of course, this instrument is not good as a will, but has it any effect as a revocation ? The law in 1813 did not require a will of personal estate to be authenticated by an attestation, or even by the subscription of the testator (*Public Administrator* vs. *Watts & Leroy*, 1 *Paige*, 347 ; 4 *Wend.*, 168) ; and although under the Statute of Frauds a revocation in writing was required to be read to the testator, and allowed by him, and proved to be so done by three witnesses, at least, yet by the new rule of the Revised Statutes, authorizing a revocation in writing executed with the same formalities with which the will itself was required to be made, I think the instrument drawn by the decedent in 1849, sufficiently executed in all formal respects for the purpose of revocation. But it does not purport to revoke the will of 1813, in terms, and not being a valid disposition, of any of the personal estate, it cannot operate as a revocation. (*Limbery* vs. *Mason*, 2 *Com.*, 451 ; *Eggleston* vs. *Speke*, 3 *Mod.*, 258 ; 7 *Vesey*, 379 ; *Barksdale* vs. *Barksdale*, 12 *Leigh.*, 535 ; *Laughton* vs. *Atkins*, 1 *Pick.*, 535 : *Reid* vs. *Borland*, 14 *Mass.*, 208.) It appears, therefore, that the will of 1813 has not been revoked by anything that has transpired since the Revised Statutes

went into operation, and it follows, that if it was a subsisting and unrevoked will in 1830, it continued to be so ever after.

The Revised Statutes have undertaken to dispose of the nice and difficult questions which had long been agitated in the Courts as to implied revocations, by defining expressly the cases in which a will or any part thereof should be deemed to be revoked. These provisions, as above stated, were intended to operate *in futuro*, and not to affect wills already revoked by implication. By the 35th Section (2 *R. S.*, 3*d ed.*, *p.* 124), marriage, with the birth of issue after the making of a will, revokes the will, if the wife or the issue survive the testator, unless provision shall have been made for such issue by some settlement, or unless such issue shall be provided for in the will, or in such way mentioned therein, as to show an intention not to make such provision ; and no other evidence to rebut such presumption of revocation shall be received. It is declared, however, by § 41, 2 *R. S.*, 3*d ed.*, *p.* 125, that "whenever a testator shall have a child born after the making of his will, either in his life-time or after his death, and shall die leaving such child so after-born unprovided for by any settlement, and neither provided for, nor in any way mentioned in his will, every such child shall succeed to the same portion of the father's real and personal estate, as would have descended or been distributed to such child if the father had died intestate, and shall be entitled to recover the same portion from the devisees and legatees, in proportion to, and out of the parts devised and bequeathed to them by such will." If this last provision is applicable to the present case, on the ground that the testator died after the statute went into effect, then all the children of the decedent will receive a full share of his property, as if he had died intestate, except Mrs. Lozier, the only child now surviving who was born before the will was made,— or, on the other hand, if the section be not applicable, then none of the children, including those born after the will

was made, will receive any part of the estate, provided the will stands.

By the civil law to exclude children, it was necessary expressly to disinherit them in the will. (*Inst. Lib.*, 2 *Tit.* 13, § 5; *Tit.* 17, § 1.) The principle of this rule was adopted by the Ecclesiastical Courts, and applied to wills of personalty at an early period. (2 *Show.*, 242; 2 *Salk.*, 592; 1 *P. Wms.*, 304, *n.*; 1 *Phill.*, 478), to the extent that marriage and the birth of a child conjointly revoked the will. It was subsequently extended to wills of real estate. (1 *Vesey, sen.*, 192; 4 *Vesey*, 848; *Dick.*, 445; *Burr.*, 2182; *Doug.*, 35.) The ground upon which it was placed after much discussion, was that the law annexes to the will a tacit condition that the party does not intend it to come into operation, if there should be a total change in the situation of his family. (*Roe. d. Fox* vs. *Marston*, 8 *Ad. & Ell.*, 14; *Israell* vs. *Rodon*, 2 *Moore, P. C.*, 51; *Jacks* vs. *Henderson*, 1 *Desaus.*, 543, 557.) Some cases found the doctrine on the presumption of an alteration of the testator's views, arising from events transpired since the execution of the will. This view is thus stated by Sir John Nicholl in the decision he rendered in *Johnston* vs. *Johnston*, 1 *Phill.*, 447: " What then is the true sense, and sound reason, and foundation of the rule itself? In looking through the several cases, the foundation upon which the presumption stands, as pretty constantly stated, is the alteration in the testator's circumstances, between the time of making his will and the time of his death. If it stood so general as the mere *alteration of circumstances*, it would be very loose indeed. If it be added, *total alteration of circumstances*, it is not much more definite. But if the cases be further examined, we shall find that Courts have required such an alteration of circumstances arising from *new moral duties*, accruing subsequent to the date of the will, as by necessary implication creates an intention to revoke." In that case, the learned Judge accordingly decided, that the concurrence of a subsequent marriage, with

subsequent birth of children, was not necessary to raise such a presumption ; that the birth of children alone was the essential basis of the proof of an intention to revoke, and if accompanied with other circumstances, favoring the implication, would justify a sentence of revocation. In *Gibbons* vs. *Caunt*, 4 *Vesey*, 840, the testator made his will after marriage and the birth of two children. He subsequently had two other children; his wife died, and he married again, but had no issue of that marriage. The point was not determined, but Lord Alvanley said, "such a case as this has never yet been decided ; the birth of children by the first wife after the execution of the will, and after the death of the wife, a subsequent marriage, and no children by that, I do not say it will have the same effect ; I am not the judge to decide that, but there is not a single argument applying to the feelings of mankind, to draw a decision from the Court, that will not apply to one case as much as the other. Conviction flashes on every man's mind, that there is just as much presumption. Why are these subsequent children less dear to him, because he happened to have other children born before ? I think the same argument would do under these circumstances." In *Brush* vs. *Wilkins*, 4 *J. C. R.*, 506, Chancellor Kent, after reviewing the English cases, and sanctioning the rule that the concurrence of marriage and the birth of children was sufficient to establish a revocation, adverts to the case of *Johnston* vs. *Johnston*, and the decision of Sir John Nicholl, that it was not essential that a subsequent marriage should concur with the subsequent birth of issue, and that the birth of a child, when accompanied with other circumstances leaving no doubt of the testator's intention, was sufficient to revoke the will of a married man, admits that that case "was indeed enforced not only by the soundest principles of justice, but by the most persuasive equity," and "was almost too strong for any Court of Justice, endowed with ordinary moral feelings and. perceptions, to resist." And although suggesting that it was questionable whether that decision

had not carried the doctrine of revocation further than the English law would warrant, he adds, " if ever such a case, with equally pressing circumstances, should occur here, I should never dissent from that opinion willingly, nor without great difficulty and unaffected regret."

If ever there was a case justifying the adoption of such a rule, I think the present is one. It is true, by the intervention of the provisions of the Revised Statutes, if they be applicable, the children born subsequent to the execution of Mr. Sherry's will, in 1813, would not be affected by the will; and the will, if sustained, would operate simply to cut off the single child now living, who was born before the date of the will; but that is a point I cannot determine, and if I could, it would not touch the question, whether the will was not revoked in 1830, before the statute went into operation. If by what had transpired previously the will was then revoked, nothing that has since occurred can justly operate to change the rule of law antecedently applicable, or to control, or alter its application. The case is a most remarkable one, and in some of its features very similar to the circumstances in *Johnston* vs. *Johnston.* There, the testator, when he made his will, was married and had children, for whom he provided. He was then worth £20,000, but 22 years afterwards he died worth £200,000, leaving three children born after the will, who of course took nothing under it, while one of the former children, as residuary legatee, would have received the whole estate.

It does not appear what was the condition of Mr. Sherry's fortune in 1830, though it may reasonably be presumed, that it was much improved from what it was in 1813, when he was a seaman. Probably on the eve of shipping as a seaman, he goes into a shipping office, executes there a power of attorney for his wages to his wife, and as was the custom, together with the power, a will in favor of his wife. Both these instruments were the usual blanks kept in the notary's office for such purposes, and

filled in with a few words in writing. They would appear to have been executed for a special occasion. They are subsequently always found together, and after the lapse of 37 years, the will is for the first time separated from its companion the power, and presented for probate as a valid will.

As I understand the English doctrine, marriage and the birth of children revoked a will by presumption of law, and this presumption could not be rebutted. But the rule that the birth of children alone, in connection with other circumstances, operated as an implied revocation, must, from the very nature of the case, admit of proof of other circumstances to rebut the presumption implied from those relied upon in connection with the birth of children, to revoke the will. The fact, that the will and the power were kept by the decedent in the usual repository of his valuable papers, were seen by him six or eight years before his death, and were found in his writing desk after his decease, is not without weight. But it appears that other old instruments were kept in the same place. And instead of there being any indication of a recognition of this old instrument as a valid will, there is a very decided, and I think, controlling circumstance, bearing precisely the other way. In *Brush* vs. *Wilkins*, the first will, which was declared to be revoked by reason of subsequent marriage and issue, was found with a second will, sealed up in the same envelope, among the testator's valuable papers. The last will was not attested. Chancellor Kent remarked upon these facts, " nor can we derive any circumstance to rebut the necessary presumption of a revocation, from the subsequent unattested will left in an envelope with the former will uncancelled. The presumption of revocation is increased by the second will, which begins with a declaration, that all former wills were revoked, &c." In *Johnston* vs. *Johnston*, the deceased made his will when about to return from the island of Jamaica to England, a few days before he sailed, and the will was left in the hands of

an agent in Jamaica. However, a copy of the will, together with an inventory of papers left by him in Jamaica including the will, were found together in his secretary, where he wrote, after his death, and these, with other facts, established the probability that he had not forgotten the will, nor had any reason to suppose it destroyed, yet these circumstances did not prevent the will from being rejected. The present case is much stronger, on this particular point, than either *Brush* vs. *Wilkins*, or *Johnston* vs. *Johnston*. Here, in 1849, the deceased draws a paper in his own handwriting, disposing of the greater part of his property, reads it to his wife and stepdaughter, and it is found at his death in his pocket-book. But the introductory words of this document are extraordinary. "I, David Sherry, of the city of New-York, &c., in my 69 year of age, I think it is time to make some distribution of what I possess in this world, as the uncertainty of life at this time, when the cholera prevails, &c." Is this the language of a man, who had at that moment a will among his private papers, disposing of all his property in favor of his wife, which he regarded as a valid subsisting and operative will? Is it not utterly inconsistent with his having another will, or with his having already made a testamentary disposition of his property, when he says that it is time to make some distribution of his possessions? And does it not come in with great and irresistible force, in support of the presumption implied by the law, that the will of 36 years ante-date, was revoked? This paper, to my mind, shows conclusively, that if any thing in favor of the will of 1813 is to be deduced from its being in the possession of the deceased with the old power, it is rebutted by the introductory statement of the paper, dated in 1849, which shows that he had not the remotest idea that the will of 1813 would operate, but on the contrary, supposed he would die intestate unless he made a new testamentary instrument.

I have already adverted to the special enactments made in England in regard to sailors' wills executed in connec-

tion with powers, as indicative of the idea, that this connection with another instrument made for a special purpose, affected the will and detracted from the ordinary presumption of testamentary intention arising from a regularly executed will. It is quite probable, that an intended voyage incited the decedent to make the power and the will. It was natural he should subsequently regard them together, as connected with the special occasion, on or for which they were made. He subsequently, 36 years after, draws a paper, which overlooks the will and speaks as if he had never made one. Though his wife and stepdaughter were aware of its existence, though, as stated by the latter, he himself had seen it within a few years, not one of them appears to have noticed it, or to have recalled or mentioned the circumstance. That instrument, disposing of the whole of his large estate, sleeps in silence, and he, unconscious of its energy, says, that at his advanced age, with a pestilence raging around, it was time to make some distribution of his worldly wealth. It is of no importance that this paper was made in 1849, for *per se* it has no revocatory effect ; but on its face it affords clear evidence of the mind of the deceased as to the will of 1813, indicating that it was not considered as operative. This is in accordance with all the other circumstances of the case, and in harmony with the implication of law. It is only on the hypothesis that he supposed it inoperative, or revoked, or that he had forgotten it, we can explain his acts and language rationally. There is not a particle of proof to show, that the deceased treated it as a will since 1813. And yet if valid, though made when his possessions, if any, were moderate, when he was a mere seaman about to ship and leave a power for his wages ; and though thereafter he accumulated wealth, his circumstances were changed, and five children were born to him ; it sweeps away his whole estate, unless these forcible circumstances are determined by the law to have sufficient power to effect an implied revocation. I think they ought to, and do, have that effect.

In saying this, I treat the case, so far as the law is concerned, as if the testator had died previous to 1830 ; and am of opinion that at that time, the will was revoked by implication derived from the peculiar circumstances attending its execution, the subsequent birth of five children, and the alteration in the decedent's circumstances. If the will was dead then, the Revised Statutes under a fair construction could not work its resurrection, or recall by operation of law a revocation previously made. The subsequent circumstances, though of themselves ineffective as to a previous revocation, still shed light upon the past, and being in harmony with an implied revocation, aid, not as facts, but as evidences towards ·its establishment. In this sense, the paper made in 1849, is pregnant with evidence of the decedent's mind as to the will, and enables the Court to say, with him, that he had made no distribution of his property ; a conclusion he might have attained without any accurate recollection, reflection, or any definite mode of reasoning, but which is consistent with the sentence of the law upon the facts. I am of opinion, therefore, that the instrument propounded for probate should be rejected.