In the Matter of the Estate of FRANK W. MOSHER, Deceased.

Surrogate's Court, Westchester County, March 15, 1932.

*Thomas A. McGrath [Westall, Stohldreier & Barrett* of counsel], for the widow, petitioner.

*Chadbourne, Stanchfield & Levy,* for the respondents, executors.

*Charles MacGregor,* for Caroline Gilson Lorenz, a legatee.

*Charles D. Cords,* for the respondents Ernest Gilson, Elmer Gilson, Rebecca Mosher and Carrie E. Mosher, individually.

SLATER, S. This construction matter relates to the application of section 35 of the Decedent Estate Law, as amended by chapter 293 of the Laws of 1919.

The decedent had been married for upwards of twenty-five years to his first wife. She died August 1, 1923. On August 9, 1923, testator made his will wherein he directed that the rest, residue and remainder of his real and personal estate be divided into three parts. One of such equal parts he gave to his sister Rebecca Mosher, another of such equal parts to his sister Carrie E. Mosher, and " one such equal part to *my friend,* Mildred Vetter." The testator married said Mildred (baptized Emily) Vetter on August 9, 1924. The testator died on the 13th day of July, 1931, without children and leaving the widow surviving him.

The principle of implied revocation of wills by marriage and birth of issue was written into our law by the revisers of 1830.

Under the civil law, in order to exclude children it was necessary to expressly disinherit them in the will. This principle was carried into the Ecclesiastical Courts and applied to wills of personalty to the extent that marriage and the birth of a child jointly revoked the will. It was subsequently extended to wills of real estate. The underlying principle was that the law annexes to a will a tacit condition that the party does not intend it to come into operation if there should be a total change in the situation of his family. (*Marston* v. *Roe d. Fox,* 8 Ad. & Ell. 14; *Israell* v. *Rodon,* 2 Moore P. C. 51; *Jacks* v. *Henderson,* 1 Desaus. [S. Car.] 543, 557.)

Here is found the reason for the rule of implied revocation. It is founded upon the family life and the law of morals. Some cases founded the doctrine of implied revocation upon the presumption of an alteration of the testator's views arising from events which transpired after the execution of the will. (*Johnston* v. *Johnston,* 1 Phill. 447.) In this case the court said: " What then is the true sense, and sound reason, and foundation of the rule itself? " The question was answered by the statement that it rested in the alteration of the testator's circumstances between the time of the making of his will and the time of his death. " If it

stood so general, as the mere *alteration of circumstances*, it would be very loose indeed. If it be added, ' *total alteration of circumstances*,' it is not much more definite.— But if the case be further examined, we shall find that courts have required such an alteration of circumstances arising from *new moral duties* accruing subsequent to the date of the will, as by necessary implication creates an intention to revoke." So it may be said that the doctrine or rule is founded upon the fact that the testator assumes family life and new moral duties and possible subsequent birth of children.

In *Brush* v. *Wilkins* (4 Johns. Ch. 506 [1820]) the will was made on March 6, 1807, and gave a legacy to Miss E. Wilkins, the residue of the estate to brothers and sisters. In June, 1808, testator married Miss Wilkins. He made another will dated March 14, 1809. His wife was then *enceinte*, and he died August 1, 1809, leaving one child. The second will, while subscribed by him, was not published. The opinion was written by Chancellor KENT. The question had never arisen before in our courts and the chancellor considered it was a case to be governed by the English law as settled at the time of our Revolution, or by general principles of reason and justice. He held it was a settled law as early as 1775 that implied revocations of wills were not within the Statute of Frauds, and that marriage and a child taken together did amount to an implied revocation; that the first time the rule was applied was in *Overbury* v. *Overbury* (2 Show. 253). This was in the time of Charles II. The rule was expressly founded upon the doctrine of the civil law. The civil law carried us back to the case stated by Cicero (de Orat. lib. 1, c. 38).

·This court believes that is far back enough ·to go for a good start.

So, upon the foundation of prior decisions, the great chancellor wrote into our law the rule of implied revocation in relation to a will. The chancellor said: " The general reasoning on this subject, in favor of the revocation, is, that the testator having contracted new relations, such as those of husband or father, he must have intended a revocation of his prior will, because he must have meant to discharge the moral duties attached to those relations. The claim of the wife * * *, in the case of a devise of land, is admitted not to be very strong * * * [because of her dower]. Her claim to a provision from the personal estate, rests on higher ground; for in respect to that portion of her husband's property, she is left entirely at the control of his will and pleasure * * *. A stronger presumption of the testator's change of mind, arises from the birth of subsequent children; * * *. They have,

therefore, a very strong natural and moral claim to a competent support and provision, out of their father's property."

Marriage and birth of a child are events of great importance in a man's life and, as such, effect powerful influences upon the final disposition of his property if he has previously made a will disposing of the whole estate without any provision in or out of the instrument looking to the contingency of afterward having a wife and child. The happening of these events affords very strong presumptive evidence of a change of intention in relation to the disposition of his property, and on this ground rests the doctrine of implied revocation of a will. The court-made rule of reason and justice was written into the statute law by the revisers.

The revision of 1830 (2 R. S. pt. 2, chap. 6, tit. 1, art. 3, § 43) provided that if, after the making of any will disposing of the *whole estate*, such testator shall marry and have issue of such marriage and the wife or issue of such marriage shall be living at such testator's death, the will shall be deemed revoked, unless (1) provision shall have been made for such issue by some settlement, or (2) unless such issue shall be provided for in the will, or (3) in such way mentioned therein as to show an intention not to make such provision; and no other evidence to rebut the presumption of such revocation shall be received.

The revisers' notes marked this section as "new," and they write that " Marriage and the birth of issue have long been held in England to operate as a presumptive revocation of a will previously made; but there has been much litigation, and there is still much uncertainty in regard to some of the qualifications of the rule. * * * The importance of the principle itself, and the doubts that are connected with it, have induced the revisers to prepare the above section, in which they have endeavored to state the rule as now recognized by the courts, and to incorporate in it all the circumstances which, in their judgment, ought to be admitted, to repel, so just and reasonable a presumption. * * * "

Section 43, now section 35, of the Decedent Estate Law has continued to rest upon principles and doctrines in relation to human conditions. Nowhere is this more true than when we are dealing with the relation existing between husband and wife. It was in the way of balancing all these interests that the early revisers wrote. They had regard for human conditions, social interests and family life. Where the wife and children were provided for, either by the will itself, or by a marriage settlement, or where the will did not dispose of the whole estate, subsequent marriage and birth of issue were not a presumptive revocation. (*Havens* v. *Van Den Burgh*, 1 Den. 27.) Nor was marriage alone or a sub-

sequent birth of issue sufficient at the time of the revision to cause a presumption of revocation to arise. Both facts must occur. The statute settled the law as to the reception of oral evidence to rebut the implied presumption. (Fowler Dec. Est. Law, 261; 1 Jarman Wills, *111.) A like human rule of justice has been written into the law of decedents' estates by the revisers of 1930.

The first reported case upon the subject after the revision of 1830 was *Adams* v. *Winne* (7 Paige Ch. 97 [1838]). The opinion was written by Chancellor WALWORTH. On the question of evidence he wrote: " I believe the revised statutes have settled the principle, which before had been left in doubt by the conflicting decisions of courts, that where the law presumes a revocation from a change in the testator's family or property after the making of his will, parol evidence of actual intention to the contrary is not admissible to rebut that presumption. * * * Although he differed with his associates as to the application of one of those arbitrary rules to a part of the case then under consideration, he was nevertheless constrained to admit that some of those rules, which evidently defeated the probable intent of the testator, had become settled rules of property which the legislative power alone had a right to change."

And in such form the rule of implied revocation continued to remain the law until 1919.

The case of *Sherry* v. *Lozier* (1 Bradf. 437 [1851]) deals learnedly with the question. Judge BRADFORD was the very able surrogate of New York county at that time. In his opinion he states the reasons for the doctrine of implied revocation and refers to the early cases. He accepts the rule laid down in *Johnston* v. *Johnston* (*supra*) that the doctrine of implied revocation " was indeed enforced not only by the soundest principles of justice, but by the most persuasive equity," and it " was almost too strong for any Court of Justice, endowed with ordinary moral feelings and perceptions, to resist."

The reason for the rule is again stated in *Matter of Rossignot* (50 Misc. 231 [1906]).

Some of the reported cases prior to 1919 had to do entirely with the question as to whether the *whole estate* was or was not disposed of by the will. *Matter of Gall* (9 N. Y. Supp. 466 [1886]; affd., 10 id. 661; affd., 131 N. Y. 593) was a case relating to a common-law marriage occurring subsequently to the execution of the will, which was held revoked by such marriage. In this will the gift was " to Amelia Steeb, a former servant of my late wife, * * *." Another phase of this case is found in 5 Demarest, 374.

*Matter of Lally* (136 App. Div. 781, 2d Dept, opinion by Justice CARR; affd., 198 N. Y. 608 [1910]) was a case where the court

held that the will made provision for afterborn children by placing the *whole estate* in trust for such children as might survive the testator.

In *McCrum* v. *McCrum* (141 App. Div. 83, 2d Dept. [1910], opinion by Justice CARR) the court decided a child born after the execution of a will and not mentioned therein or provided for by such, was entitled to his intestate share, although an intention to disinherit the child may be found from the fact that the mother being pregnant executed the will within a few days of the birth of the child.

In *Matter of Del Genovese* (169 App. Div. 140 [1915], 2d Dept.) Justice PUTNAM restates the early law on the doctrine of implied revocation by marriage and birth of children, and states: " It is the change by marriage and parenthood that the law presumes were not in the mind of the maker of the ante-nuptial testament. * * * Under our statute marriage and parenthood do not raise a *presumption* of an intention to revoke, but are *in themselves* a revocation, unless express provision be made in view of the new duties arising from the changed relation." He further stated that " it has been settled that the rules applicable have reference to the existing state of facts at the time the will itself was made. * * * It follows that subsequent acquisition of property, and an augmenting of the estate after the execution of such ante-nuptial will, cannot prevent this revocation * * *."

It likewise must follow that subsequent diminution of property, as well as subsequent acquisition, cannot be considered as affecting the question of revocation. (*Havens* v. *Van Den Burgh,* 1 Den. 27, 32.)

Under the prohibition of the statute, proof of increased property or decreased property after the making of the will cannot repel the statutory rule to revoke a will not being made in *view of marriage and parenthood* with no provision in the will or out of it looking to such duties.

The subject was discussed in *Matter of Andrest* (96 Misc. 389 [1916]).

In 1919 the section was amended by being disjointed and broadened, and made to read so that it may become effective by either event — marriage, or birth of issue after marriage. (Laws of 1919, chap. 293.) The first reported case after the amendment is *Matter of Schuster* (111 Misc. 534 [April, 1920], Surrogate's Court of Westchester county). In this case the question of the early history of implied revocation was written upon, and the foundation reason for the rule of implied revocation stated.

In *Matter of Gaffken* (114 Misc. 693 [March, 1921], opinion by

Surrogate WINGATE; affd., 197 App. Div. 257, 2d Dept., opinion by Justice PUTNAM; affd., 233 N. Y. 688, without opinion) the court held that the provision in the will for Mary Louise Krom, who was the testator's wife at the time of his death, was a provision for the wife within the meaning of the statute. The will was made *June 12*, 1914, wherein one-third of the estate was given to Mary Louise Krom. On *June 14, two days later*, he married Mary Louise Krom. The main contention was whether the statute in force prior to 1919 prevailed, or whether the amended section prevailed, the court deciding that the section in force at the time of the testator's death was effective. The reflected light from this case upon the instant situation is the reference and consideration given to the fact of the marriage *two days* after the making of the will, and that one-third of the estate was given to the future wife, under her maiden name.

*Matter of Dexter* (116 Misc. 17 [June, 1921]) in part turned upon the question whether the old or new section 35 was applicable. The testator was unmarried at the time he made his will, which gave *all* of the property to a person who subsequently became his wife. Later, children were born of the marriage. The court decided that the will was revoked as to the children, and that the wife was provided for in the will. Taking out the children's intestate part, there was nothing more to give the widow.

*Matter of Reilly* (130 Misc. 320 [July, 1927]) was decided by Surrogate O'BRIEN. In this will a substantial sum of money was given to a " *dear friend* William F. Reilly  *  *  *  on account of the many kindnesses  *  *  *  shown and rendered to me over a long period of years  *  *  *." Afterwards came marriage, death and a contest over section 35. About one year and two weeks elapsed between the making of the codicil and the marriage. The husband contended that the words in section 35, "*or they shall be provided for in the will*," meant a provision in contemplation of a marital status. None of the cases heretofore mentioned reached the Court of Appeals for determination upon this point. This is the first case deciding what is meant by the term " or they shall be provided for in the will." Taken literally, of course, it means a ten-cent provision or a million-dollar provision. Let us see what Surrogate O'BRIEN said about it. It was contended that the provision given on account of many kindnesses, by its very terms, was not made in contemplation of subsequent marriage, and, therefore, is not such a provision within the meaning of the section. The other contenders claimed the law must be construed literally, and that the legacy given was a provision for the future husband within the meaning of the section. The surrogate disagreed with this contention, and expressed the

opinion that the bequest in the codicil was not such a provision as was contemplated by section 35. He referred to *Brush* v. *Wilkins* (4 Johns. Ch. 506), which antedates the revision of 1830, which case set forth the reason for the rule and he construed the word " provision " as one *in contemplation of marriage* and in anticipation of the natural claims that would follow such a state. He said it must be assumed that the exceptions made in the statute were intended to cover cases where marriage was in the mind of the maker of the will. This case was not appealed.

The next writing upon the question is found in *Matter of Scolpino* (137 Misc. 58 [June, 1930]) by Surrogate BAILEY of Putnam county, wherein the facts were these: The decedent in his will bequeathed to Mary Bertavelli a sum of money, at which time she was the wife of one Dominick Bertavelli. Two years after the will-making her husband died and a year and a half later testator married Mary Bertavelli. The residuary legatees contended that the legacy to her was a sufficient provision for the widow within the law, and that, as to her, the will was not revoked, citing *Matter of Gaffken* (*supra*) to uphold their contention. The surrogate said that the testator, at the time of his will-making, could not have contemplated his marriage to Mary Bertavelli. The case was appealed and affirmed. The decision was by Justice CARSWELL of the Second Department (231 App. Div. 690).

The widow asserted that the facts of the marriage and the language of the will compelled a rejection of the claim of the legatees under the will, and that the conclusion was inescapable that the will made no provision for her as widow. This is laid upon the reason that she was another man's wife at the time of the will-making and for two years thereafter, and was the widow of that other man for two more years. Such facts repel the conclusion that the gift was to her " in the *prospective status* of wife of the testator."

Justice CARSWELL summarizes the effect of section 35 upon the rights of a widow in the first authoritative opinion upon the subject in recent years. He held that, when a testator marries after making a will, it *is revoked* unless the *manner of reference* to the individual named is such as fairly to warrant the view that the reference, or bequest, to her is in her prospective, or new, status of wife. If the reference to her is in a *different status*, then the provision for her does not save the will from revocation. If the reference to her is by her maiden name but the *period of time* between the making of the will and the marriage is *short* and the provision in the will is of such *character* as to indicate that it was made *with the change of status in mind*, then the provision in the

will may be construed to have been made in contemplation of the new status, and the presumption of revocation is overthrown. Such a provision is construed to be an antenuptial bequest. If the *language* of the will is of such a *character* as to indicate that the testator, *with the prospective status in mind,* made the provision for the individual in his prospective status, even though there be a *considerable lapse of time* between making of the will and the marriage, such language so construed overthrows the presumption. He held that the bequest was to her in her status of a *mere friend* at a time and under such circumstances as preclude it being held that it was made in prospect of her becoming the wife four years later.

It is not clear that the learned justice, in the use of the words " *language* " and " *character,*" intended to convey the idea that he referred to the volume of the estate — that the amount of the gift became one of the tests to be applied.

*Matter of Simon* (138 Misc. 658 [Dec. 1930]; revd., 232 App. Div. 214 [May, 1931]) turned upon whether the conditional gift to the *fiancée* was any provision at all. The facts in this case are that the marriage was made *four days* following the making of the will in which he referred to the legatee as his " *fiancée.*" Justice Townley, in writing for the Appellate Division, held that a conditional gift was sufficient. The use of the word " *fiancée* " and the almost immediate marriage were sufficient to have the court declare the provision, even if conditional, to have been made in contemplation of marriage. He said further that the reason for the rule is that the change resulting from marriage and parenthood is not presumed to have been in the mind of the maker at the time the will was made.

The very able Surrogate Foley of New York county has recently written upon this question in his usual learned and convincing manner in *Matter of Bent* (142 Misc. 811) and *Matter of de Coppet* (Id. 816). *Matter of Bent* is similar to the instant case, while the *de Coppet* case clearly indicates the presence of a prospective change in status which is not in the instant case.

In the instant case the contention is that, *if any provision is made,* it is sufficient if marriage follows, in either a short or a long period of time. This contention cannot be upheld. Because of the age-old reason for the doctrine, the courts have given the words " unless they shall be provided for in the will " a meaning other than literal; *i. e.,* that the gift must be made in the prospective, or new, status of wife of the testator; in other words, that marriage is contemplated. The respondents further contend that the provision in the will is of such a character, by its proportion of amount

given to the whole estate, as to indicate that it was made with the change of status in mind, and so should be construed to have been made in contemplation of the new status and the presumption of revocation is overcome, even though there be a considerable lapse of ·time between the making of the will and the marriage. Because of this contention, the court took proof, over objection of petitioner's counsel, as to the general net worth of the decedent's assets at the time of the will-making. The court will decide to overrule the objections of petitioner's counsel and admit respondents' evidence as to the general value of decedent's estate at the date of the will.

In my opinion, the value of property at any time is not the true test, whether such amount be great or small. The doctrine of implied revocation is not founded upon the value of the gift unless it was considered by the will-maker in connection with the prospective or new obligations to be assumed in discharge of a moral duty as husband and father. As a lone factor it has no worth. The prospective change of status must be shown to be present. The implication to be found in a gift alone is too indiscernible and remote. The rise and fall of a man's fortune is not considered. (*Havens* v. *Van Den Burgh, supra; Matter of Del Genovese, supra.*) The money test is found in the first category of provisions under section 35 which refer to a marriage settlement. Status alone nullifies the presumption of revocation. (*Matter of de Coppet, supra.*)

In the instant case the widow testified without objection, in fact with the assent of opposing counsel, as follows: " Q. At the time of making the will in question here and which has been probated in this court and dated August 9, 1923, did you have any understanding or agreement with the decedent contemplating any marriage by you to him? A. No."

In making my decision, I have given no weight to the widow's testimony. The facts adduced make the decision upon the rule of justice and reason. It is unnecessary to state what might have occurred if her answer had been " Yes."

The will gives one-third of the estate to *" my friend Mildred Vetter."* It is made eight days after the death of a wife to whom the testator had been married for twenty-five years. It is true they had lived apart for some of the time, but the marriage contract existed until her death. The will was executed probably six days after her burial. It would be most extraordinary for any testator, within nine days after the death of a wife, to have in mind the prospective status which grows out of another marriage. The controlling consideration in these cases is whether the gift

contained in the will was made in a prospective status as husband. I find nothing whatever in the record, nor in the will, that leads me to believe that the testator contemplated marriage when he executed his will.

The fact that the testator never changed or destroyed his will, and that he may not have realized the full legal consequence of his act of marriage, is no more material in this connection than in any other branch of the law.

I hold that the *language* of the will is not of such a *character* as to indicate that the testator, with the prospective status in mind, made the provision for the future wife, even though a period of one year elapsed between the making of the will and the marriage. The time between the will-making and the marriage is not *short*. The maiden name is used, as well as the distinguishing words " my friend." and no different status appears to be disclosed by the will. The language of the will contains no provision for the widow of the testator as such, and the marriage of the testator, being subsequent to the making of the will, effected the revocation so far as the widow was concerned. The widow is entitled only to take her intestate share. (*Matter of Bent, supra.*)

The Fourth Supplemental Report of the Commission to Investigate Defects in the Law of Estates (p. 15), which was submitted to the Legislature of 1932, suggests a change in section 35 of the Decedent Estate Law. The proposed legislation to amend the Decedent Estate Law in relation to the revocation of the will by marriage is now before the Legislature.

Submit decree in accordance with this opinion and decision.